## LEWIS et al. v. CHICAGO, S. F. & C. RY. CO.

*(Circuit Court, E. D. Missouri, N. D. December 7, 1891.)*

**1. CONSTRUCTION OF CONTRACT—PERFORMANCE.**
The provision in a contract for railroad grading that the measurements and calculations by the railroad company's chief engineer of the quantity and amount of the several kinds of work, and his classification of the materials contained in excavations, shall be final and conclusive, is a valid provision, and is binding upon the parties to the agreement, and there can be no recovery in excess of his final estimate, in the absence of fraud, gross error, or mistake.

**2. SAME—RELIEF AGAINST MISTAKE.**
The court will relieve against mistakes in measurements and calculations apparent upon the face of the estimates, or clearly proven, though not so apparent, or from oversight to measure or estimate any particular part of the work, or from wrong constructions put upon the provisions of the contract by the engineer; but will not relieve against alleged mistakes in determining the kind of materials found in the several cuts, the parties being bound by the judgment of the engineer selected by them for special skill and attention as the umpire on such questions; nor will it relieve against slight discrepancies in measurements.

**3. SAME—RAILROAD GRADING.**
Under the provisions of a contract for railroad grading, excavations were to be measured and paid for either as earth, loose rock, or solid rock; loose rock to comprise "shale or soapstone lying in its original or stratified position, coarse boulders in gravel, cemented gravel, hardpan, or any other material requiring the use of pick and bar, or which cannot be plowed with a strong, ten-inch grading plow, well handled, behind a good six mule or horse team." *Held*, that the materials mentioned were to be classified as loose rock, irrespective of the plowing test, which was only applicable to the "other material," not specifically named.

**4. SAME.**
It appeared that the material in all cuts, except rock cuts, varied much in consistency and hardness, and lay in irregular strata, and that the largest part of it was broken up by the plow. *Held*, that the practice of the engineer in estimating loose rock by percentages was justifiable in the circumstances.

In Equity. For prior report, see 39 Fed. Rep. 52.

STATEMENT BY THAYER, DISTRICT JUDGE.

This was a suit to recover a balance claimed to be due for grading a portion of defendant's railroad in the state of Missouri. The plaintiffs were subcontractors under McArthur Bros. The contract under which the work was done contained the following clause:

"The work shall be executed under the direction and supervision of the chief engineer of said railway company and his assistants, by whose measurements and calculations the quantities and amounts of the several kinds of work performed under this contract shall be determined, and whose determination shall be conclusive upon the parties hereto; * * * and said chief engineer shall decide every question which can or may arise between the parties in the execution of this contract, and his decision shall be binding and final upon both parties. And whereas, the classification of excavation provided for in the annexed specifications is of a character that makes it necessary that special attention should be called to it, it is expressly agreed by the parties to this contract that the classifications, measurements, and calculations of the said engineer of the respective quantities of such excavation shall be final and conclusive."

The defendant pleaded this provision of the contract, and further alleged that the chief engineer of the railway company had made a final estimate of the quantity of work done, and that the railway company

had paid the amount of such estimate, and were not further liable. The plaintiffs contended that the provision of the contract was not binding upon them; and, furthermore, that the estimate of the chief engineer ought to be disregarded for fraud and mistake on the part of the engineer. Plaintiffs also claimed that they had done certain extra work, not embraced by the provisions of the contract. The specifications attached to the contract under which the work was done contained the following clause:

"*Excavation in Loose Rock.* \* \* \* Loose rock shall comprise: *First.* Shale or soapstone lying in its original or stratified position, coarse boulders in gravel, cemented gravel, hardpan, or any other material requiring the use of pick and bar, or which cannot be plowed with a strong, ten-inch grading plow, well handled, behind a good six mule or horse team. *Second.* Detached rock or boulders in masses exceeding 1½ cubic feet and less than one cubic yard."

By the terms of the contract, all of the material found in the excavations was to be measured either as earth, loose rock, or solid rock. The grubbing specification referred to in the opinion was as follows:

"Measurements for grubbing will include all area under embankments and within six feet of slope stakes; also all area within slope stakes of excavations, and within area of all necessary borrow pits where grubbing is necessarily done."

It appeared in the evidence that the engineers of the railway company, in classifying the material found in the various cuts along the line of plaintiffs' work, had measured the total quantity of material found in the cuts, and allowed a certain percentage thereof as loose rock, based upon their observation of the number of animals that were used in plowing it. As the engineers construed the specifications, shale, cemented gravel, hardpan, etc., were not classified as loose rock, unless more than six horses or mules were required to plow such substances.

*Craig, McCrary & Craig,* for plaintiffs. *Gardiner Lathrop, Ben Eli Guthrie,* and *T. L. Montgomery,* for defendant.

THAYER, District Judge, (*after stating the facts as above.*) For the information of counsel the court states the conclusions it has reached concerning the various questions of law and fact that have arisen in this case as follows:

*First.* The second clause in the contract, declaring that the engineer's measurements and calculations of the quantity and amount of the several kinds of work, and also that his classification of the material contained in excavations, shall be "final and conclusive," is a valid provision, and is binding upon the parties to the agreement. Therefore there can be no recovery in excess of the engineer's final estimate, unless such estimate is successfully assailed for fraud, gross errors, or mistake. *Railroad Co.* v. *March,* 114 U. S. 549, 5 Sup. Ct. Rep. 1035; *Wood* v. *Railroad Co.,* 39 Fed. Rep. 52, and citations; *Sweet* v. *Morrison,* 116 N. Y. 19, 22 N. E. Rep. 276; *Brush* v. *Fisher,* 70 Mich. 469, 38 N. W. Rep. 446.

*Second.* The estimate may be impeached for fraud; that is to say, it may be shown that the engineers in charge intentionally underestimated or overestimated the work. It may also be impeached by proof of gross errors in the measurements and calculations. If the evidence shows such errors, it either creates the presumption of fraud, or warrants the conclusion that the engineers did not exercise that degree of care, skill, and good faith in the discharge of their duty which the law exacts; and in either event the court will disregard the estimate so far as is necessary to do substantial justice. The meaning of the word "mistake," as above employed, must be carefully defined.

(*a*) The court will relieve against mistakes in measurements and calculations that are apparent on the face of the estimate, or that are clearly proven, though not so apparent.

(*b*) If it is satisfactorily shown that the engineers failed, through oversight, to measure or estimate any particular part of the work, the court will grant relief as to such mistakes.

(*c*) If it appears that the engineer in charge put a wrong construction on any provision of the contract, the court will correct any substantial errors resulting from such mistake, for the reason that the parties did not make the decision of the engineer as to the proper interpretation of the contract final, and conclusive. It is the province of the court to construe the agreement. *Bridge Co.* v. *City of St. Louis,* 43 Fed. Rep. 768.

(*d*) But in determining the kind of material found in the several cuts, the engineers were called upon to exercise their judgment. That was a matter, as the contract in substance recites, which involved the exercise of special skill and attention as the work progressed, and for that reason the parties selected an umpire, by whose judgment they agreed to be bound. *Ranger* v. *Railway Co.*, 1 Eng. Ry. Cas. 1; 13 Sim. 368. The court will not undertake to revise the decision of the engineer on questions of that character if it appears that he acted in good faith. The utmost it can do is to correct errors of classification that may have resulted from an erroneous interpretation of the contract.

(*e*) Slight discrepancies in measurements made by the respective parties must also be disregarded; and even when there are discrepancies of some magnitude the court must accept measurements made by the engineers of the railway company, unless the proof clearly shows that they are erroneous. The presumption is that all measurements made by such engineers are correct, and the burden is on the plaintiffs to overcome that presumption. *Torrance* v. *Amsden,* 3 McLean, 509; *Bumpass* v. *Webb,* 4 Port. (Ala.) 65; *Pleasants* v. *Ross,* 1 Wash. (Va.) 156.

*Third.* After an attentive consideration of the question, the court concludes that the engineers put a wrong construction on the second clause of the specifications, in so far as they construed the "plowing test" to be applicable to shale, soapstone, cemented gravel, and hardpan, as well as to other hard, earthy substances. The right interpretation of the clause is as follows: Shale, soapstone, cemented gravel, and hardpan were known substances, and were known to be hard to handle. Therefore it was declared that they should be classified as loose rock. And, inas-

much as it was thought probable or possible that other hard earths might be encountered in the progress of the work, it was agreed that any other material requiring the use of pick and bar, or that could not be plowed "with a strong, ten-inch grading plow, * * * behind a good six horse or mule team," should likewise be classified as loose rock. This is the correct exposition, and truly expresses the thought in the mind of the draughtsman.

But the court is of the opinion that the practice pursued by the engineers of estimating loose rock by percentages was justifiable and proper. Under all the circumstances of the case, that seems to have been the only fair and practicable method of classifying much of the material when the plowing test was applied. The evidence satisfies me that the material handled varied much in consistency and hardness, and lay in irregular strata. By far the largest portion of all the material found in the various cuts, except the rock cuts, was broken up, I think, by the use of a team of not more than six horses. Probably that was the most practicable and economical method of working the cuts, as an eight-horse team is usually cumbersome. Nevertheless, if the engineers had classified every cubic yard of earth that was so broken up with six horses "as earth excavation," it would not have accorded with the spirit of the contract. The application of that rule to the work of those contractors who had much hard material to handle, and very little easy plowing, would have been manifestly unjust. On the other hand, it would have been contrary to the spirit of the agreement, and equally unfair to the railway company, to have classified all of such material as loose rock. In short, the contract must be interpreted in a reasonable manner, with a due regard for the rights of both parties, and with a proper appreciation of the nature and magnitude of the undertaking, and the difficulties encountered in applying the plowing test to the subject-matter. In the light of such considerations as these, the specifications will not admit of the construction that it was the duty of the engineers to draw a rigid line, under all circumstances, between earth and loose rock, and to classify a given material as all loose rock, unless a six-horse team was able to plow therein continuously, from day to day, and to turn a full ten-inch furrow. As the contract did not define what should be esteemed plowing, or describe to what extent it should be impossible to plow with six horses, to entitle the contractor to loose rock classification, there was a grave difficulty in applying the force test to much of the material, and upon the whole I am satisfied that the engineers properly solved that difficulty in accordance with the spirit of the agreement by allowing a given percentage of loose rock, basing the percentage upon their observation of how the material was handled, and the difficulties actually encountered in moving it. This conclusion is fortified by the fact that these plaintiffs did not object to the method of classification by percentages while the work was in progress. Such objections as they made were to the amount of the allowance, rather than to the method by which it was ascertained. Finally, while expressing

my views on questions of interpretation, I will add that the grubbing specification was properly construed by the engineers. The fair reading of that specification is that "measurements for grubbing will include all areas under embankments, and within slope stakes of excavations, and the areas of all borrow pits, where grubbing is necessarily done." Any other view would be taking advantage of a mere error of punctuation in framing the grubbing clause.

*Fourth.* Having announced some general propositions in accordance with which the court has considered the evidence, I may as well say at the outset that there is very little testimony in the case tending to show that any of the engineers in charge of the work intentionally underestimated it. I am well satisfied, and accordingly find, that the chief engineer and his assistants intended to deal fairly with the contractors, and that in making measurements, computations, and classifications for the final estimate they aimed to allow them all that was due under the terms of the contract as they construed it.

*Fifth.* The evidence in the case fails to satisfy me that there are any substantial errors in the measurements or calculations as made by the engineers. By this I mean to say that the gross contents of the excavations and embankments, the total haul and overhaul, and the total amount of clearing, grubbing, and close chopping, seem to have been ascertained with substantial accuracy. At all events, the testimony is insufficient, at this late day, to warrant a contrary conclusion. Nor has it been shown to the satisfaction of the court that the engineers failed, through oversight or otherwise, to measure or estimate any work that was actually done by the plaintiffs.

*Sixth.* In view of the unsatisfactory character of the testimony, I have not felt at liberty to allow any of the claims for extra work. I can only take time to mention a few of the more important items of this kind.

(*a*) The rock ditch on section 192 was a part of the contract work, and was properly estimated and paid for at contract rates. It was a hard job, and the contractors undoubtedly lost money on the work; but the court cannot, for that reason, allow the claim.

(*b*) I have found it impossible to determine from the testimony before me how much material was handled in the spring of the year 1888 in filling up and finishing the house track at Revere station. It is most probable, I think, that the final estimate was based on measurements that included that work; and that it was work necessary to be done to complete the contract.

(*c*) With reference to the claim for carrying and piling up rock ballast on section 193, it will suffice to say that the railway company paid rock prices for the excavation and haul, and the evidence leaves it uncertain whether any piling was in fact done, or whether it was merely dumped from cars.

(*d*) The company seems to have made the contractor an allowance for the broken rock placed in cut No. 2 to bring it up to grade, and I am unable to say that the allowance for that work was inadequate.

*Seventh.* It must have become apparent to all persons who have been concerned in the trial of this suit, and others of a similar character, that the litigation owes its origin to differences of opinion on questions of classification. If conflicting views on that point had been reconciled, no controversy would probably have arisen as to other matters. It is also probably true that the railway company and the contractors underestimated the cost of grading and excavation on some sections of the road, for the reason that much of the material encountered proved to be more difficult to handle than either party had anticipated. After carefully re-reading all of the testimony, I have reached the conclusion that the engineers did not classify some of the excavations made by the plaintiffs (particularly on sections 188 to 191) as highly as they should have done, or as highly, perhaps, as they would have done, had they properly construed the second clause of the specifications. I am far from entertaining the view that all the material found in the cuts, lying underneath the subsoil, or even below the gumbo, was hardpan, within the meaning of that term as employed in the specifications. In my judgment the word "hardpan," as ordinarily understood among railroad contractors, means something more than clay or very hard clay. It is no doubt difficult to give an exact definition of the word, because the substance varies somewhat in composition in different localities. Nevertheless I feel satisfied that there was some material found in the cuts on the Lewis, Wood & Penny work which the engineers might fairly have classified as "loose rock," without regard to the plowing test, because it was hard-pan, or cemented gravel; and my best judgment is that the classification of some cuts was too low, and that the plaintiffs sustained injury, because the plowing or "force test" was applied indiscriminately to all the material, on the erroneous assumption that it was the only test applicable to the case. In a letter written by McArthur Bros. to Mr. Robinson, the chief engineer, under date of March 21, 1888, after the final estimate was received, I find the following statements, to-wit:

"The classifications which you give for cuts on sec. 187 to 191 are, we think, uniformly too low; much lower than classifications elsewhere on the work. To these we wish to call your particular attention."

Then, after suggesting a considerable increase in the classification of certain cuts, (which was not allowed,) they say of the proposed increase, this "is as low as we think any competent and fair man who saw the work done would put them. * * * This part of the work was distant from Mr. Lamborn's office, and not often seen by him in its progress." McArthur Bros. appear to have been fair-minded men, and to have acted very impartially in the course of all the disputes that arose concerning questions of classification. They had also had large experience in railroad construction, and were thoroughly conversant with the subject to which they alluded. I am satisfied that they expressed their honest convictions in the paragraphs of the letter above quoted, and their views under the circumstances are entitled to great weight. The result has been that the court has determined to raise the classification

on cuts Nos. 5, 9, 10, 11, 13, 14, 15, and 16 in sections 188 to 191 to the following extent:

| On cut | 5 | to 60 | per cent. of the total contents of the cut. | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| " " | 9 | " 40 | " | " | " | " | " | " | " | " |
| " " | 10 | " 40 | " | " | " | " | " | " | " | " |
| " " | 11 | " 60 | " | " | " | " | " | " | " | " |
| " " | 13 | " 40 | " | " | " | " | " | " | " | " |
| " " | 14 & 15 | " 50 | " | " | " | " | " | " | " | " |
| " " | 16 | " 60 | " | " | " | " | " | " | " | " |

The other cuts were estimated with substantial accuracy and fairness. The court has taken Mr. Brooker's estimate of the total contents of these cuts, and has ascertained the amount already paid according to the old classification, and has also computed the amount due according to the new classification. The sum due is found to be $3,578.19, for which amount and interest from the time this suit was brought a lien is allowed.