ELLIOTT v. MISSOURI, K. & T. RY. CO.

(Circuit Court of Appeals, Eighth Circuit. April 17, 1896.)

No. 721.

1. CONTRACTS—CONSTRUCTION.
  A provision in a contract that the report of an engineer, inspector, or arbiter as to the amount and quality of the work done or material furnished under a contract shall be conclusive upon the parties to the agreement is a legal stipulation, and can only be set aside for fraud or for such gross mistakes as imply bad faith or a failure to exercise an honest judgment.

2. SAME — PERFORMANCE — CERTIFICATE OF INSPECTOR—QUESTIONS OF MEASUREMENT, ETC.
  When the parties to a contract for the performance of work or the furnishing of material agree that the report of an inspector or arbiter as to the amount and quality of work done or material furnished shall be conclusive, the report of such inspector or arbiter is as conclusive upon questions of count, measurement, or distance as upon other matters, although these questions may be capable of accurate measurement.

3. SAME—MISTAKE OF INSPECTOR.
  One E. made a contract with the M. Ry. Co. to furnish it a quantity of railroad ties, for which he was to be paid certain prices for first-class and second-class ties, respectively; first-class ties being specified to be 8 feet long, no more and no less, 6 inches thick, and fully 8 inches wide, full hewn, free from score marks, not winding, and with all bark removed. The contract provided that the railroad company should appoint an inspector to inspect and classify the ties, whose inspection and judgment should be binding on E. The railroad company afterwards refused to pay for a quantity of ties accepted by its inspector, on the ground that his classification was incorrect, and, E. having sued for the price of the ties, the railroad company filed a bill to enjoin the prosecution of the action, and, failing to show any fraud on the part either of E. or the inspector in

respect to his report, sought to sustain such bill on the ground of the inspector's mistakes. It appeared that many of the ties accepted by the inspector did not precisely conform to the dimensions given in the contract. It also appeared, however, that it was the universal custom in such cases to accept ties not varying from the specifications more than one inch in length, one-half inch in breadth, or one-quarter inch in thickness, and the railroad company's own inspector of ties testified that it would be almost utterly impossible to comply literally with such specifications. It also appeared that the reinspection of the ties, on which the railroad company based its claim of mistake, was made by a clerk from the office of the railroad company and two other employés, who measured the ties and rejected all which measured one-sixteenth of an inch under 8 feet on the shortest side, and all not so rejected which were deficient in width or thickness. *Held*, that the evidence wholly failed to establish a mistake on the part of the inspector so gross as to imply bad faith or failure to exercise an honest judgment on his part, which were the tests of the right to set aside his decision, and, accordingly, that the bill should be dismissed.

Appeal from the Circuit Court of the United States for the Western District of Missouri.

This is an appeal taken by John S. Elliott from the decree of the circuit court which enjoins him from prosecuting an action at law in the court below to recover the purchase price of certain railroad ties, which he furnished to the Missouri, Kansas & Texas Railway Company, the appellee, under certain contracts between them. These parties agreed in these contracts: That the appellant should furnish a large number of cross-ties to the railway company, that the railway company should pay him for all ties delivered at the rate of 33 cents and 38 cents, each, for first-class ties, and at the rate of one-half of those prices for second-class ties. That "said ties are to fully conform to the following specifications: They must be eight (8) feet long, no more and no less, six (6) inches thick, and fully eight (8) inches wide at the narrowest end; must be full hewn, free from score marks, and not winding, and with all bark removed. The ends of all ties must be sawed off. All ties must be cut from white oak, post oak, and burr oak, and must be piled at places of delivery in open cribs, having alternate layers of two and five ties, and on even ground." That "the party of the second part [the railway company] shall appoint an inspector to inspect and classify all said ties, and his inspection and judgment of said classification shall be binding on said first party. No ties shall be considered delivered on this contract until inspected by said inspector, passed upon, and received by him." The railway company appointed its inspector, and the appellant delivered his ties under these contracts during the months of February, March, April, May, and June, 1892. The inspector examined, classified, and accepted the ties. He reported to the railway company the number of each class of ties that the appellant had furnished during each of these months, and the company paid him for the ties he delivered during February, March, and April, on the basis of these reports, but it refused to pay him on this basis for those delivered in May and June, on the ground that the classification made by its inspector was incorrect. The appellant thereupon brought his action at law for the purchase price of these ties upon the basis of the reports of the inspector. The railway company then exhibited its bill in the court below to enjoin this action at law. It alleged in this bill that the appellant, Elliott, had fraudulently claimed and represented to the inspector that a first-class tie was not a tie which fully complied with the terms of the contracts, but that it was such a tie as it was the custom to accept upon Western railroads; that the inspector thereupon ignored the specifications of the contracts, and counted and classified, according to this custom, a large number of the ties as first-class ties that were in fact second-class ties; that this classification was erroneous and fraudulent; that the company subsequently made a second inspection and classification according to the specifications of the contracts; and that the fraudulent count and classification of the inspector charged the company, at the prices fixed in the contracts, with $5,293.91 more than it actually owed to the appellant.

The appellant answered this bill. In this answer he denied that he ever made any claim or representation to the inspector that a first-class tie was not one which fully complied with the specifications of the contracts, or that it was such a tie as was customarily accepted on Western railroads; denied that the inspector ignored the contracts, or counted or classified the ties according to any such alleged custom; and averred that he left the counting and the classification of the ties solely to the judgment, knowledge, and discretion of the inspector and that his count and classification were just and correct under the terms of the contracts. The case was referred to a master to find the facts and to report his conclusions of law. He found that the ties in dispute, which the inspector reported as containing 70,262 first-class ties and 5,644 second-class ties, were subsequently counted and classified by the employés of the railway company as containing 38,567 first-class ties and 37,225 second-class ties, and that this variance in the count and classification resulted in a difference of $5,293.91 in the amount due under the contracts. He found that the allegations of the bill that the appellant made fraudulent statements and representations to the inspector, to the effect that the ties should be counted and classified according to an alleged custom on Western railroads, and not according to the specifications of the contracts, were not sustained by the evidence; that there was no proof that the appellant ever made any such statements or representations; and that any mistakes or errors that were made in the count or classification of the inspector were the mistakes and errors of the inspector, in which the appellant had no part. He made numerous findings upon other issues, which are not material in the view of the case taken by this court, and he reported as one of his conclusions of law that the appellant was entitled to recover the entire amount which he claimed in his action at law. The railway company filed exceptions to this report, which present the question of the correctness of this legal conclusion. The circuit court sustained these exceptions, held that the error of the inspector in his classification was so gross that the appellant was not entitled to recover upon the basis of the report, that the amount due him was $5,293.91 less than the amount claimed in his action at law, and rendered a decree which perpetually enjoined him from prosecuting it. It is upon the appeal from this decree that this case is now before us for consideration.

John Cosgrove and W. M. Williams, for appellant.

Geo. P. B. Jackson, for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

A provision in a contract to perform work or to furnish material, that the report of an engineer, inspector, or arbiter as to the amount and quality of the work done or material furnished under the contract shall be conclusive upon the parties to the agreement, is a legal and binding stipulation, and can only be set aside for fraud, or for such gross mistakes as imply bad faith or a failure to exercise an honest judgment. Kihlberg v. U. S., 97 U. S. 398; Sweeney v. U. S., 109 U. S. 618, 3 Sup. Ct. 344; Railroad Co. v. March, 114 U. S. 549, 553, 5 Sup. Ct. 1035; Railroad Co. v. Price, 138 U. S. 185, 11 Sup. Ct. 290; Lewis v. Railway Co., 49 Fed. 708; Williams v. Railway Co., 112 Mo. 463, 20 S. W. 631. The contracts in this case provided that the railway company should appoint an inspector to inspect and classify the ties; that his inspection and judgment of said classification should be binding upon the appellant; that no ties should be considered delivered under the contracts until they were inspected, passed upon, and received by this inspector; and that the railway company

would pay to the appellant the prices named in the contracts for all ties so delivered thereunder. The legal effect of these provisions was to make this arbiter's "inspection and judgment of the classification" of the ties as binding upon the railway company as upon the appellant. This was its legal effect, because the company thereby agreed that his inspection and classification should constitute a delivery of the ties to it, and that it would pay to the appellant the stipulated prices for the ties so classified and received. Under these contracts the railway company appointed one I. W. Brewton inspector. According to his classification and report, the appellant is entitled to recover $5,293.91 more than he is awarded by the decree. The appellant is enjoined from collecting this amount, not on the ground that either the appellant or the inspector was guilty of any fraud upon the company, for there is no evidence in support of that charge, but on the sole ground that Brewton committed mistakes so gross in his classification of the ties that he cannot escape the just imputation of bad faith.

Before entering upon the consideration of the question whether the charge of gross error in the inspector's classification, on which this decree rests, is established by the evidence in this case, we will dispose of a preliminary objection to his report and classification. This objection is in the nature of a demurrer to the report. It is that his classification is of no binding force because it was made without authority. The argument is that the only error claimed in this case was in estimating the dimensions of the first-class ties,—that the dimensions of these ties were fixed by the contract, that they were capable of accurate ascertainment by actual measurement, that the dimensions of each tie necessarily classified it, that there was no room for the exercise of the judgment of the inspector, and hence that, in every case in which he reported as a first-class tie one that was not eight feet long, eight inches wide, and six inches thick, his action was ultra vires, and without binding force. The answer to this argument is that these parties agreed that Brewton's inspection and judgment of this classification should be conclusive upon them. They evidently supposed, when they made these contracts, that disputes might arise between them over matters as easy of ascertainment as the number and dimensions of 75,906 cross-ties, and they provided an arbiter to settle these disputes, and covenanted to abide by his decision. Their supposition proved to be in accordance with the fact. The contracts and appointment accordingly invested the inspector with the power, and imposed upon him the duty, to ascertain the dimensions of these ties, and to classify them under the contracts in accordance with these dimensions and their other qualities, and his classification, when made, was as conclusive as to their dimensions, as it was as to their other qualities. There is no moral law and no rule of public policy which forbids parties to submit to another for determination or decision questions of count, measurement, or distance, although these questions may be capable of accurate ascertainment. In Kihlberg v. U. S., 97 U. S. 398, 400, 401, an action was brought against the United States upon a contract for the

transportation of military, Indian, and government stores and supplies from points on the Kansas Pacific Railway to posts and stations in certain states and territories.   The action was brought to recover compensation at the contract price per 100 pounds for transporting the goods the distances they were actually carried under the contract.   The contract contained the provision that transportation should be paid for in all cases according to the distance from the place of departure to the place of delivery, and that this distance should be ascertained and fixed by the chief quartermaster of the district of New Mexico.   The quartermaster had erroneously fixed the distances less than they were by the customary routes of travel, and less than they were by air lines.   Of course, these distances were capable of definite ascertainment by measurement.   But the court of claims and the supreme court held that the finding of the quartermaster was conclusive on this question, and that the contractor could not recover for transporting for any greater distances than those which the quartermaster had fixed.   In delivering the opinion of the court, Mr. Justice Harlan declared that, "in the absence of fraud or such gross mistake as would necessarily imply bad faith and a failure to exercise an honest judgment," the finding of the quartermaster was binding upon the parties to the contract.

It will not be futile to call to mind, before we review the evidence in this record, that it is not every gross mistake that will avoid the finding of such an arbiter.   In Railroad Co. v. March, 114 U. S. 549, 553, 5 Sup. Ct. 1035, an action was brought upon a contract for grading a railroad, which contained the provision that the final estimate of the work done, material furnished, and the amount due therefor, made by the engineer of the company, should be final and conclusive upon the parties.   The trial court charged the jury that the final estimate of the engineer was conclusive unless it appeared from the evidence that he was guilty of fraud or intentional misconduct or gross mistake.   The supreme court declared that this charge was erroneous, because the court did not inform the jury that the mistake must be so gross or of such a nature that it necessarily implied bad faith on the part of the engineer.   In delivering the opinion of the court, Mr. Justice Harlan said:

"We are to presume from the terms of the contract that both parties considered the possibility of disputes arising between them in reference to the execution of the contract.   And it is to be presumed that in their minds was the possibility that the engineer might err in his determination of such matters.   Consequently, to the end that the interests of neither party should be put in peril by disputes as to any of the matters covered by their agreement, or in reference to the quantity of the work to be done under it, or the compensation which the plaintiff might be entitled to demand, it was expressly stipulated that the engineer's determination should be final and conclusive.   Neither party reserved the right to revise that determination for mere errors or mistakes upon his part.   They chose to risk his estimates, and to rely upon their right, which the law presumes they did not intend to waive, to demand that the engineer should, at all times, and in respect of every matter submitted to his determination, exercise an honest judgment, and commit no such mistakes as, under all the circumstances, would imply bad faith."

In Railroad Co. v. Price, 138 U. S. 185, 195, 11 Sup. Ct. 290, the supreme court recited the above quotation with approval, and declared that the mere incompetence or mere negligence of an engineer in such a situation would not meet the requirements of a suit to be relieved from the effects of his estimates, unless his mistakes were so gross as to imply bad faith. Perhaps these authorities sufficiently illustrate the legal proposition upon which the decision of this case must rest.

The question, then, is, has the railway company proved such gross mistakes in the classification of the ties made by its inspector as imply bad faith or a failure to exercise an honest judgment on his part? The burden of proof was upon the railway company to establish these mistakes. Not only this, but the legal presumption was that the measurements, inspection, and classification of this inspector were accurate and just. Lewis v. Railway Co., 49 Fed. 708, 710; Torrance v. Amsden, Fed. Cas. No. 14,103; Bumpass v. Webb, 4 Port. (Ala.) 65; Pleasants v. Ross, 1 Wash. (Va.) 156. The general presumption is that an officer or agent has faithfully discharged his duty. But the presumption here is stronger than that. These parties chose this inspector to count and classify these ties for them, and agreed to be bound by his report. They knew him, and they would not have selected him unless they believed him to be competent and trustworthy. Their selection raises the presumption that he was so. He was appointed by the railway company, and was employed and paid by it. The charge the company now makes is that he made gross mistakes against its interests, and in favor of a contractor who, the evidence proved, never solicited him to do so. It is not a common experience to find a disinterested employé making mistakes against his employer and in favor of a contractor. Thus it will be seen that the railway company is met at the threshold of this case with adverse presumptions on every side. It ought to present very convincing evidence to sustain the burden of proof, and to overcome all these presumptions. What, then, is the evidence on which it relies? It consists of two items of proof: First, the fact that all the witnesses for the appellant, as well as those for the railway company, conceded and testified that there were a great many of the ties that were classified as first-class by Mr. Brewton, that were not exactly eight feet long, eight inches wide, and six inches thick; and second, the fact that Brewton classified 70,262 out of 75,906 ties in dispute, or 93 per cent. of them, as first-class ties, while the agents of the railway company, in a subsequent inspection, classified only 38,567 out of 75,792 of them, or only 51 per cent. of them, as first-class ties.

The concession that the ties did not literally and exactly comply with the specifications of the contracts is without probative force, when these specifications, the character of the subject-matter to which they relate, and the evidence in this record are carefully considered. The contract by its terms required these ties to be "eight (8) feet long, no more and no less, six (6) inches thick, and fully eight (8) inches wide at the narrowest end; must be full

hewn, free from score marks, and not winding, and with all bark removed. The ends of all ties must be sawed off." Now, the fact is indisputable that a variation in railroad cross-ties from eight feet in length, by as much as one-half an inch or an inch, would not affect their value or efficiency in any appreciable degree. Moreover, a requirement that every first-class tie should be eight feet long under these contracts, without the variation of a hair's breadth, would be a technical and unfair construction of the specifications, a construction that our common knowledge of the nature of the subject-matter teaches us that the parties never intended. The evidence before us sustains this view. It is full and uncontradicted to the effect that it is the universal custom, under such specifications, to accept as first-class ties those which do not vary more than one inch from the length, or more than one-half an inch from the width, or more than one-quarter of an inch from the thickness, specified in the contract, and that the parties to this contract had adopted this custom in their construction of these very specifications. These facts lead irresistibly to the conclusion that they intended that the contracts should be construed in accordance with this custom. Kimball v. Brawner, 47 Mo. 398; Cole v. Skrainka, 105 Mo. 303, 310, 16 S. W. 491. That this is the true construction of these contracts becomes indisputable, when we learn from the evidence that a technical and literal compliance with the specifications would be impossible. This fact stands established by uncontroverted testimony in this record. The witnesses for the railway company so testify. Mr. Rockwell, its roadmaster, said that he did not suppose that any man on earth could technically comply with the specifications of these contracts. Mr. Gaunt, its tie inspector, testified that it "would be a matter of almost utter impossibility to come literally up to the specifications. There probably would not be over one or two out of a hundred that would come up to the specifications in every particular, because specifications allow nothing for length. They call for a tie eight inches wide, six inches thick, and eight feet long, and it is almost a matter of impossibility to get one that will not vary a little in length and width and thickness." No construction of a contract, which would render it impossible of performance, ought to be adopted, if it is susceptible of any other rational construction. Thus it appears that, in view of the subject-matter of the contracts, the construction of them adopted by the parties themselves, and the usage in the classification of ties under such specifications as they contain, the concession that many of the ties reported by Brewton as first-class ties did not literally and exactly comply with the specifications in their dimensions has no tendency to prove any gross mistake or failure to exercise an honest judgment on the part of this inspector.

The only evidence, then, to support this charge that Brewton committed such a gross mistake, is the fact that he classified about 42 per cent. more of the ties as first-class than did the agents of the railway company, who subsequently inspected them. It goes without saying that the mere fact that a clerk in a railroad office, who never made an

inspection of a tie, made a classification of these ties widely different from that made by the inspector chosen by the parties, would not establish the mistake of the inspector, unless the clerk made a more accurate and correct classification than the inspector. In the absence of such proof, the presumption would be that the inspector was right and that the clerk was wrong. Whether or not this subsequent classification made by the agents of the railway company established the mistake of the inspector must therefore depend upon the character of that inspection and the competency of the men who made it. Who, then, made the second classification, and how was it made? The railway company sent one Stevens, who was a clerk in its general offices at St. Louis, and who had never before inspected a tie, to measure the length of all these ties, and it sent other employés to measure their width and thickness, and to determine the quality of the wood they contained. The vice president and general manager of the company instructed Mr. Stevens to measure these ties, and to reject and mark as second-class every tie which measured as much as one-sixteenth of an inch less than eight feet long on its short side, although it might measure more than eight feet on another side. The evidence is uncontradicted that Stevens measured and classified every one of these ties under these instructions at this second inspection, and there is no evidence that any other person measured any of them. The inspection and classification was conducted in this way: Stevens first measured the length of the ties with a pole eight feet long and put a chalk mark on the end of every tie that did not measure eight feet. The ties he so marked were thereby classified as second-class ties, and the employés who assisted him did not examine or measure them at all. They followed about three or four piles behind him and measured the width and thickness of the ties, which he had found to be eight feet long, and had not marked with the chalk. If they found any of these ties deficient in width or thickness, they marked them with chalk, and they thereby became second-class ties. Those that were not chalked by any of these employés were then counted as first-class ties. When the inspector, Brewton, made his classification, he accepted as first-class all ties that were otherwise sufficient that were not more than one inch short. Stevens rejected and marked as second-class all that were not at least eight feet long on all sides.

It has not escaped our attention that it is claimed by counsel for appellee that the employés who made the second inspection also accepted as first-class all ties that were not more than one inch short, but a careful examination of this record has satisfied us that this claim is not sustained by the evidence. Only two witnesses testify that these employés took this course, and the evidence conclusively shows that neither of them knew anything about it. These two witnesses followed after Stevens during a portion of the time when he was making his inspection, and measured the width and thickness of the ties which he had not already chalked and rejected as first class. One of them testifies that he never measured the length of the ties, and that he knew nothing about whether the measurements of Stevens were accurate or not, and the other testifies that he did not

remember that he ever measured the length of a single tie. On the other hand, Stevens testifies that he did measure the length of all the ties; that if a tie was fully eight feet long or more he accepted it as a first-class tie, but that if it was one-sixteenth of an inch short, he threw it out; and that, if a tie was not exactly square on the ends, and he measured it on the short side, he threw it out and marked it as second-class, notwithstandng it might have been eight feet long on the other side. This is the testimony of the only man who measured or classified these ties as to length on this second inspection, and it stands uncontradicted by any witnesses who had any knowledge of the fact. It was undoubtedly true. There is no other evidence in this record to show how the difference between the first and second classifications of these ties arose. None is needed. This testimony is a full and complete explanation of the discrepancy. Mr. Gaunt, tie inspector of the company, testified that it would be a matter of impossibility to make the ties come literally up to the specifications; that there would not be over one or two in a hundred that would come up to the specifications, because specifications allow nothing for length. In view of this testimony, and in view of the subject-matter, it is no wonder that, by rejecting all ties that were short one-sixteenth of an inch on any side, Stevens succeeded in making 42 per cent. more second-class ties than the inspector chosen by the parties, who accepted all that were within an inch of eight feet long. If Stevens had rejected all ties that were more than one-sixteenth of an inch too long on any side, he might undoubtedly have made 84 per cent. more second-class ties.

No discussion is necessary to show that such an inspection and classification as this is utterly incompetent to establish a gross mistake by a presumably competent inspector. Much less is it sufficient to overcome the presumptions of honesty, trustworthiness, and faithful discharge of duty which surround the report of the chosen arbiter of the disputes of these parties, or to establish a mistake so gross as to imply bad faith or the failure to exercise an honest judgment on his part. It tends rather to establish incompetence to inspect ties on the part of the purchasing clerk who made the second classification as to length, or instructions from the railway company to make an unfair inspection and an unjust classification. The railway company failed, in our opinion, to prove its case. The decree below must accordingly be reversed, with costs, and this case must be remanded to the court below, with directions to dismiss the bill, and it is so ordered.