UNITED STATES, for Use of HUDSON RIVER STONE SUPPLY CO., v. VENABLE CONST. CO.

(Circuit Court, N. D. Georgia. June 8, 1903.)

No. 1,488.

1. WITNESSES—EXHIBITS TO TESTIMONY—USE OF RECORDS AS MEMORANDA.

Copies of the records in the office of the engineer in charge of a government work, giving the measurements of masonry and the quantities of materials used therein, whether or not admissible as evidence in themselves in an action between private parties, may be used by the engineer as exhibits to his testimony, and referred to therein as the basis for the measurements and quantities testified to by him, whether the measurements were made by him, or by different subordinates and reported to him; and tables compiled from such records by the engineer, for the purpose of computing the total quantity of a certain material used, may likewise be so used and referred to.

2. CONTRACTS TO FURNISH BUILDING MATERIAL—DETERMINATION OF QUANTITY—STIPULATION TO ACCEPT ENGINEER'S ESTIMATE.

A contract for the furnishing of stone to the contractor for building government coast batteries provided that final settlement should be made "on final estimates rendered for said work by the engineer officer in charge." Held, that an estimate of the quantity of stone used, made by the engineer officer in charge from the measurements of the masonry in place and other records in his office, from which he computed the average quantity of stone used in a cubic yard of such masonry by what appeared to be a fair and practical method, was conclusive on the parties.

Action against Government Contractor to Recover for Materials Furnished. On exceptions to auditor's report.

Daniel W. Rountree, for complainant.
Hoke Smith and H. C. Peeples, for defendant.

¶ 2. See Contracts, vol. 11, Cent. Dig. §§ 1326, 1331, 1334, 1335.

NEWMAN, District Judge. This case is now before the court on exceptions to the report of the auditor to whom reference was made under an order, which, so far as is material here, was as follows:

"In this case it appearing to the court that the controversy in the case involves among other things the ascertainment of the actual quantity of stone delivered by the Hudson River Stone Supply Company to the Venable Construction Company, and it appearing to the court that the ascertainment of the facts in this regard in advance of the trial by jury will be of great aid to the court and jury in the hearing of the case:

"Counsel consenting, it is ordered that for the purpose of ascertaining the amount of stone so delivered, this matter is referred to Shepard Bryan, Esq., as auditor, to find and report the facts in this regard. Let the auditor's report show when and in what quantities deliveries of stone were made.
* * *"

The Venable Construction Company had a contract with the government for the construction of certain gun and mortar batteries at Key West, Fla. It was necessary for the Venable Construction Company to have considerable stone in carrying on this work, and it entered into a contract with the Hudson River Stone Supply Company, on March 25, 1897, for approximately 36,000 cubic yards of stone—2,600 cubic yards being stone crushed and screened to pass through a three-eighths inch ring, and the balance through a one and one-half inch ring—and this stone was to be used to make concrete in constructing the gun and mortar batteries.

A provision in the contract between the Venable Construction Company and the Hudson River Stone Supply Company was as follows:

"It is mutually agreed between both parties hereto, that all measurements of stone shall be taken by U. S. government engineer on arrival of the vessel at Key West, and his certificate of the cubical contents shall be accepted to the number of cubic yards contained therein, in settlements between them. All freight to be paid according to said measurements, twenty per cent. (20%) in cash, and balance in New York or Baltimore Exchange, and the balance for stone thus delivered, on the 15th of each month, for all stone delivered the month previous, less 10% retained until completion of the contract.

"Final settlement to be made on final estimates rendered for said work by the engineer officer in charge, detailed measurements to be rendered parties of the second part, as each boat is measured and discharged."

The auditor in his report, after discussing the contentions of the parties, and of the evidence and facts of the case at some length, reaches a conclusion, which will be shown by extracts from his report, as follows:

"I have been very much puzzled in getting at the real truth in this case. The evidence of the experiments made has not been satisfying. The measurements made by both parties have been unsatisfactory. The theories presented by the plaintiff and defendant are so radically and extremely different, the plaintiff contending that the amount of broken stone in 32,440 cubic yards of concrete is about 10 per cent. more than the yardage of concrete, and the defendant contending that the cubic yardage of broken stone in the same amount of concrete is about 10 per cent. less than said yardage.

"After reading and considering all the testimony which has been offered, and after much reflection, I have reached the conclusion that, when broken 1½-inch stone is used to make concrete, there is no increase in the cubic yardage of the resulting mass. I am satisfied as to this point. I believe that there is no considerable decrease. It is true that the defendant's testimony tends to show that in one instance 100 cubic feet of broken stone made 108

cubic feet of concrete, and in another instance 100 cubic feet of stone made 111 cubic feet of concrete. This difference was accounted for by the difference in tamping. * * *

"I have reached the conclusion that the amount of broken 1½-inch stone contained in 32,440 cubic yards of concrete in place in the fortifications at Key West, Florida, was 32,440 cubic yards. In my opinion, not enough sand and cement was added to entirely fill the voids; indeed, I consider this fact as thoroughly demonstrated by the testimony.

"As I have said before in this report, I do not believe that there was any increase in the mass over the number of cubic yards of stone used.

"I therefore find that the Hudson River Stone Supply Company furnished to the Venable Construction Company 32,440 cubic yards of broken inch and a half stone, and 382.5 yards of granolithic stone."

The real question in this case is as to how much of the broken stone went into a cubic yard of concrete, as contained in the gun and mortar batteries. The plaintiff contends that there was more stone than concrete, and the defendant contends that there was less stone than concrete. The materials used in preparing the concrete, and the proportions of the same, were as follows: One cubic yard of cement, two cubic yards of sand, and five cubic yards of stone. The plaintiff contends that when the stone, sand, and cement are thus placed together in a solid mass, and "tamped," as it is called, the sand and cement fill what are called "voids," that is, the space between the broken stone, and cause the stones to adhere more closely together, thereby making the cubical contents of the mass less than the stone would be if measured before such mixture. The defendant takes the contrary view, and claims that the mass is increased. The special master found, as has been shown from the extracts from his report given above, that a cubic yard of concrete contained a cubic yard of stone. The engineer officer in charge of the work at Key West, on behalf of the United States government, was J. M. Braxton. The testimony of Mr. Braxton was twice taken in this case, and the same was offered in evidence before the auditor. It is a little difficult to get at the exact ruling of the auditor about this testimony. Objection was made on behalf of the plaintiff to its admissibility in parts and as a whole, and special objection was made to the admissibility of certain tables attached to the last set of interrogatories. These tables were referred to by Mr. Braxton in his evidence as containing various measurements and quantities necessary to arrive at the amount of stone which went into the concrete. There seems to have been a difference in the character of the concrete; that is, what is called "concrete No. 1," "concrete No. 2," and "concrete No. 3." The tables attached to Mr. Braxton's interrogatories show the amount of concrete of each kind, and it also shows the number of what are called "skips," and the contents of the skips. These skips were used to convey the material to the batteries. The result of the whole testimony of Mr. Braxton, taking his answers to the interrogatories and the tables together, is that he fixed the total amount of stone which went into the 32,440 cubic yards of concrete at 29,147 cubic yards. The stress of the argument by counsel in this case has been directed to the question of the admissibility of this testimony of Mr. Braxton's, and the effect to be given it, if admitted.

Counsel for the defendant insist that the papers attached to Mr. Braxton's testimony are admissible as public records. Attached to the papers so exhibited is the following:

"I certify that the foregoing sheets are correct copies of the official records in the U. S. Engineer's office at Key West, Fla.

"Key West, Fla., April 16, 1902.                                J. M. Braxton."

Counsel for plaintiff earnestly contends that these papers are not admissible as official records, and the question has been elaborately argued by counsel for both parties, orally and in briefs furnished to court.

There was also objection to these papers, called "official records," on the ground that they appear to have been made up from the notes of various inspectors assigned to different parts of the work, the work of each being entirely separate and distinct from the others, and the notes thus made being transcribed by clerks into books from which the record was taken; and, further, that Mr. Braxton did not himself make any of the counts or measurements, and therefore could not testify of his own knowledge as to the accuracy of the figures given.

In my opinion, it is immaterial whether these papers certified to by Mr. Braxton are admissible as official records or not. They are attached as exhibits to his testimony, and referred to by him in his answers to interrogatories as a part of his answers, and as giving the information sought to be elicited as to quantities, numbers, measurements, etc. It is a very ordinary form of taking testimony for a witness to attach a paper and to say the paper attached, marked "A" or "B," is a correct statement of the amounts, numbers, etc. The testimony of Mr. Braxton shows that he had general supervision over the work on the gun and mortar batteries, and this, as well as other evidence, shows that Mr. Braxton was the engineer officer in immediate charge of the work at Key West. It seems from his testimony that he had 18 inspectors; that separate inspectors were assigned to supervise particular portions of the work, and they made entries, statements, or memoranda in notebooks, showing what was done on the piece of work to which they were assigned. Mr. Braxton states that he did not personally make all the measurements, but, as chief inspector, he had to keep a general outlook on all the work going on, to see that specifications were being carried out, and he says: "It was my duty to submit at the end of each month certificates covering the work done by the contractors. I had to keep posted as to how calculations were made on which to base my estimate." Mr. Braxton made the estimates upon which the government settled with the Venable Construction Company.

It seems that the method which was adopted for ascertaining the amount of stone going into the gun and mortar batteries was based on the contents of skips, and the number of skips. A "skip" was a wooden box in which the concrete, mixed, was transported to the place of deposit. One skip was composed of one barrel of cement, four cubic feet, measured loose; eight cubic feet of sand, measured loose; and twenty cubic feet of stone, measured loose. Those were the component parts of one batch of Rosendale concrete. In further explanation of Mr. Braxton's method of arriving at the amount of

stone going into the gun and mortar batteries, a quotation is given from his testimony, as follows:

"The following is an estimate for concrete No. 1, which is referred to in specifications as 'Rosendale concrete.' The total number of skips placed in certain walls of mortar battery up to February 1, 1898, was 6,215. This is the record of the skips as entered into the government's official records kept by inspectors on duty at the mortar battery up to the above-mentioned date. The total number of cubic yards of concrete in the walls above referred to, into which these 6,215 skips were used, was calculated to be 5,083 cubic yards. This is the official measurement of the number of yards of concrete in the aforesaid walls, and which was the number for which the Venable Construction Company were paid by the government. From the number of skips given, and the number of cubic yards of concrete, it is found that one skip made 22.08 cubic feet in place. The amount of concrete was greater than the amount of stone used in each skip, 20 cubic feet of stone being required in one skip of Rosendale concrete, and the amount of concrete after this stone had been mixed with sand, cement, and water, and had been tamped into place, was 22.08 cubic feet."

He also gives other data, as follows:

"Concrete No. 2 in specifications is Portland concrete, required to be mixed in the proportions of one of cement, three of sand, and five of broken stone. The Atlas Portland cement was used for the greater portion of the work. One barrel of the Atlas Portland cement, measured loose, was found to contain 4.42 cubic feet. The amount of stone used for this mixture was 22.10, and 13.26 cubic feet of sand was used. This mixture was found to give 27.62 cubic feet of concrete in place. This was derived by calculating the amount of concrete in place from 452 skips. Alpha Portland cement was also used in concrete No. 2. One barrel of Alpha cement was found to contain four cubic feet, measured loose. With the Alpha cement there was used 20 cubic feet of stone and 12 cubic feet of sand. One skip of this mixture was found to make 25.47 cubic feet of concrete in place. This is based on record of small number of skips."

Some question was raised as to the skips not being properly filled, and, as to this, Mr. Braxton, in his testimony, says:

"Most of them were measured by others, and not by myself. I consider my knowledge as based on seeing the skips measured a great many times, seeing the proper lines put into the barrows or boxes, and having an eye, through all of the work, that the proper measurements were being given. I did not personally count the number of skips given. It is taken from the official records. The information is derived from the records and calculations made by myself and others, and the entries were made by myself and others."

It appears from what has been stated that the method of arriving at the amount of stone going into these gun and mortar batteries was by ascertaining the amount of stone contained in a skip, and then finding the number of skips going into a given quantity of concrete, and then measuring the whole amount of concrete, thereby determining how much stone had been placed in the walls. A portion of the concrete had been placed before this method of ascertaining the quantity of stone commenced, but the same calculation was applied to it as to the remainder of the concrete, for the purpose of ascertaining the amount of stone.

No question is made, as I understand it, as to the total quantity of concrete. It was put by Mr. Braxton, and fixed by the auditor, at 32,400 cubic yards. The only question is as to the quantity of stone contained in this concrete yardage. I have gone over this testimony

very carefully, and it seems to me it shows an honest and intelligent effort on the part of Mr. Braxton to ascertain 'and give the exact amount of stone going into these gun and mortar .batteries. Of course, in such work it is utterly impossible for one man to count all the material, make all measurements, and see personally to every detail of the work. Mr. Braxton seems to have done what engineers in charge of large constructions like this always do. It was necessary for him to rely to a large extent upon the fidelity and correctness of his subordinates, and the exercise of proper care in the supervision of the work on their part. My conclusion is that Mr. Braxton's testimony was admissible, and that the auditor should have considered the same in determining the amount of stone going into this work. The total amount of this stone, as taken from Mr. Braxton's testimony would be, as I understand from the auditor's report, 29,147 cubic yards. If there be any slight variation from this, it can be corrected.

Mr. Braxton's testimony being admitted, the question is as to the effect to be given it. An extract has been given above from the contract between the Hudson River Stone Supply Company and the Venable Construction Company, in which it was agreed as follows: "Final settlement to be made on final estimates rendered for said work by the engineer officer in charge." It must have been intended by this provision, as the language is susceptible of no other construction, that the engineer officer in charge of this work at Key West should determine the amount of stone furnished by the plaintiff to the defendant, and that upon his estimate of the same settlement should be made by the defendant to the plaintiff.

It may be stated here that it was also agreed that measurements of stone should be taken by the United States government engineer on arrival of the vessel at Key West, and his certificate of the cubical contents should be accepted, as to the number of cubic yards contained therein, in settlements between them. It appears from the evidence, however, and does not seem to be seriously contested, that it was found impracticable to do this, as the engineer officer declined to make measurements and ascertain the quantity of stone in this way. The testimony on this subject is from Mr. S. H. Venable, and, being rather important, is quoted as follows:

"Q. Were you there when Mr. Ed. Mayer came as the representative of the Hudson River Stone Supply Company to represent them in the measurements? A. I was, sir. Q. About how long did he stay there? A. I think he was there possibly two or three weeks. Q. What was the result of his joint measurements with the representatives of the Venable Construction Company? Did you learn from him whether he agreed with their measurements, or disagreed with them? A. He agreed with them. Q. Now go on with what took place. A. Well, Mr. Mayer came down there— I think he got there over the Mallory line on Wednesday, and he was there two or three weeks. I am not sure he came on that line, however, but he was there two or three weeks, and he measured the boats with our engineers at the time—during the time he was there—and his measurements differed from the measurements sent by the Hudson River Stone Supply Company. I had a conference with him several times—in fact, he was there in my office—and I asked him about the measurements, and he stated that the engineer and himself had agreed upon the measurements; that is, the measurements that we reported to the Hudson River Stone Supply Company, which was less than the amounts that they had billed out to us. And, finally, I don't know why they sent for him, but

he finally went home. He notified me one evening that he was going to leave; that he couldn't see what good it would do for him to remain there, as our measurements seemed to be all correct."

It appears there was nothing left but for the quantity of stone to be determined by the engineer officer in charge by some such reasonable and practical method, as seems to have been adopted in this case. The effect to be given a clause such as that above quoted, agreeing to settle by the final estimate of the officer in charge of the work, has been clearly settled by the courts. In Elliott v. Railway Co., 74 Fed. 707, 21 C. C. A. 3, decided by the Circuit Court of Appeals for the Eighth Circuit, Judge Sanborn, delivering the opinion of the court, says:

"A provision in a contract to perform work, or to furnish material, that the report of an engineer, inspector, or arbiter as to the amount and quality of the work done or material furnished under the contract shall be conclusive upon the parties to the agreement, is a legal and binding stipulation, and can only be set aside for fraud, or for such gross mistakes as imply bad faith or a failure to exercise an honest judgment. Kihlberg v. U. S., 97 U. S. 398 [24 L. Ed. 1106]; Sweeney v. U. S., 109 U. S. 618, 3 Sup. Ct. 344 [27 L. Ed. 1053]; Railway Co. v. March, 114 U. S. 549, 553, 5 Sup. Ct. 1035 [29 L. Ed. 255]; Railroad Co. v. Price, 138 U. S. 185, 11 Sup. Ct. 290 [34 L. Ed. 917]; Lewis v. Railway Co. (C. C.) 49 Fed. 708; Williams v. Railway Co., 112 Mo. 468, 20 S. W. 631 [34 Am. St. Rep. 403]."

To the same effect is Crane Elevator Co. v. Clarke, 80 Fed. 705, 26 C. C. A. 100; also Newman et al. v. U. S. (C. C.) 81 Fed. 122.

In U. S. v. Gleason, 175 U. S. 588, 20 Sup. Ct. 228, 44 L. Ed. 284, in the opinion by Mr. Justice Shiras (page 602, 175 U. S., and page 233, 20 Sup. Ct., 44 L. Ed. 284), it is said:

"Another rule is that it is competent for parties to a contract, of the nature of the present one, to make it a term of the contract that the decision of an engineer, or other officer of all or specified matters of dispute that may arise during the execution of the work, shall be final and conclusive, and that, in the absence of fraud, or of mistake so gross as to necessarily imply bad faith, such decision will not be subjected to the revisory power of the courts." Martinsburg & Potomac Railroad v. March, 114 U. S. 549, 5 Sup. Ct. 1035, 29 L. Ed. 255; Chicago Santa Fé R. R. Co. v. Price, 138 U. S. 185, 11 Sup. Ct. 290, 34 L. Ed. 917.

Unless, therefore, in this case it is shown that there was fraud, or mistakes so gross as to necessarily imply bad faith, the decision of the engineer officer in charge as to the amount of stone going into this work should be final and conclusive between the parties. There is nothing whatever in the facts appearing in this record to justify the conclusion that there was either fraud or gross mistake. On the contrary, it certainly shows an honest effort to arrive at the truth, and fails to show any gross mistake, even if any criticism can be made upon its entire accuracy. It must be true, therefore, that the final estimate and decision of Mr. Braxton, the engineer officer in charge, as to the amount of stone going into these gun and mortar batteries, furnished by the Hudson River Stone Supply Company, is final and conclusive between the parties.

It is deemed unnecessary to go into a discussion of all the evidence in detail, and the points so ably discussed by counsel on both sides of this case. The decision I have reached renders any further elaboration of the questions involved unnecessary.

124 F.—18

In view of what has been said above, and the testimony of Mr. Braxton being admitted and given the effect stated, it is also unnecessary to consider the question so earnestly discussed by counsel as to whether the auditor's report is conclusive, or only prima facie correct; and as to whether the reference to him should be considered as a common-law reference, or a reference under the statutes of the state of Georgia.

The necessary result of all the foregoing is, that the exceptions to the auditor's report are sustained; Mr. Braxton's testimony is held to be admissible, and, when admitted, his evidence, embodying the tables attached to his interrogatories, contains a final estimate and decision as to the amount of stone furnished by the Hudson River Stone Supply Company to the Venable Construction Company; and under the provision of the contract between the parties, such estimate and decision is conclusive as between them on that question.