Argued September 24, 1918, affirmed February 11, rehearing denied
July 15, 1919.

# SWEENEY v. JACKSON COUNTY.*

(178 Pac. 365; 182 Pac. 380.)

**Parties—Joinder—Complaint.**

1. Whether there has been a proper joinder of parties defendant
depends largely upon the case as stated by plaintiff in his complaint,
however it may turn out upon the merits.

**Courts—Jurisdiction—Answer to Merits.**

2. Where defendant answers to the merits, court's jurisdiction over
such defendant becomes complete.

**Appearance—General Appearance After Special.**

3. Trial of cause on merits after special appearance attacking juris-
diction of court is in effect a general appearance.

**Venue—Action Against County—"Necessary Party."**

4. Contractor's action on road building contract against county and
bank to which contractor had assigned as collateral security amount
due under pretended final estimate of county's indebtedness claimed
by contractor to be erroneous, but which bank insisted could not be
set aside to its prejudice, was properly brought in county in which
bank was situated, though different from defendant county, under
Section 396, subdivision 3, L. O. L.; the bank being a "necessary
party" under Section 393.

**Highways—Construction Contract—Conclusiveness of Engineer's Esti-
mate.**

5. Stipulation in road building contract that state highway engi-
neer's estimate as to work done and value therefor to be paid by
county is of essence of contract, and in absence of fraud or gross
mistake implying bad faith or failure to exercise honest judgment is
binding upon both parties as to disputes subsisting and open to arbi-
tration.

**Highways—Construction—State Highway Engineer's Estimate—Er-
rors—Sufficiency of Evidence.**

6. Evidence *held* to show such gross and palpable errors in classify-
ing and estimating the amount of work performed under road build-
ing contract making state highway engineer's estimate final, that it
was impossible for state highway engineer's final estimate to be the
result of the exercise of honest judgment.

*For authorities discussing the question of conclusiveness as be-
tween municipality and contractor of decision of engineer or other
empowered officers as to matters concerning contract for public im-
provement, see note in 23 L. R. A. (N. S.) 317.        REPORTER.

Highways—Construction—State Highway Engineer's Estimate— Errors—Correction.

7. Where state highway engineer's final estimate of work performed under contract making such estimate final showed such gross and palpable errors that it was impossible for result to be the exercise of honest judgment, the estimate should be set aside and corrected.

Highways—Construction—Contractor's Compensation—Engineer's Estimate—Errors.

8. State highway engineer's estimate of work performed under contract making such estimate final is only *prima facie* correct, and where it appears that that estimate is not fair, and is result of reports of incompetent subordinates and not of an impartial hearing and determination, equity will set aside estimate and determine contractor's compensation.

Highways—Construction—Compensation of Contractor—Extra Work.

9. Where contract contemplated work to be performed during summer, but because of right of way complications contractor was required to postpone work until winter months and because thereof and by reason of change of plans was required to do considerable work not contemplated by contract, he could recover therefor under stipulation in contract providing for additional compensation for extra work.

Highways—Construction of Contract—"Earth."

10. The word "earth," within highway construction contract providing for contractor's compensation for removal thereof embraced clay, sand, loam, gravel and all hard material that can, in opinion of engineer, be reasonably plowed, and all earthy matter or earth containing loose stones or boulders intermixed and all other material that does not come under the classification of hard-pan, loose rock, solid rock, shell rock and solid rock borrow.

Highways—Construction of Contract—"Hard-pan."

11. The term "hard-pan," within road building contract providing for contractor's compensation for removal thereof, includes material, not loose or solid rock, that cannot in the opinion of the engineer be reasonably plowed on account of its own inherent hardness.

Highways — Construction   of   Contract — "Earth" — "Hard-pan" — "Adobe."

12. Where road building contract provides for compensation for removal of "earth" and "hard-pan" but not for "adobe," and where there was evidence that adobe could not be practically plowed or blasted out, adobe will not be classed as earth or hard-pan, and contractor will be given reasonable cost of excavating it.

### ON PETITION FOR REHEARING.

Appeal and Error—Review—Determination.

13. Where plaintiff did not appeal in an equity case, the appellate court cannot increase the award in his favor even though it hears the case *de novo.*

93 Or. —7

Appeal and Error—Review—Determination.

14. Under Section 556, L. O. L., the appellate court hears an equity case *de novo*, and it may affirm the decree though it bases the affirmance on reasoning differing from that of the trial court.

Highways—Contracts—Action.

15. In an action by a highway contractor against a county, evidence *held* sufficient to establish his claim for additional compensation, etc.

From Multnomah: George N. Davis, Judge.

In Banc.

This is an appeal by the county of Jackson from a decree entered against it, in favor of the plaintiff John W. Sweeney in the sum of $82,533.20. By the same decree, it is adjudged that the defendant United States National Bank is entitled to a lien on the sum awarded to the plaintiff Sweeney to the amount of $39,996.50.

An outline of the facts leading up to the litigation is as follows: The county had sold bonds aggregating $500,000 under the provisions of Chapter 103 of the Laws of 1913, for permanent road construction. By Section 24 of that act, the county was to prepare plans and specifications and invite bids in conformity with such plans and specifications. By Section 4 of Chapter 339 of the Laws of 1913, the state highway engineer was required to act in an advisory capacity to the County Court, and upon request was to furnish plans and specifications for road construction. On the third day of July, 1913, the County Court for Jackson County petitioned the state highway commission to make available to the court, the services of the state highway engineer under the provisions of said Chapter 339. On the twenty-first day of July, 1913, the highway commission, by resolution, directed the state highway engineer to aid said county in the planning,

locating and constructing a system of permanent roads
within said county.   Copies of these proceedings are
in evidence, and may be seen on pages 21 and 22 of
the First Annual Report of the Department, for the
period ending November 30, 1914.   Accordingly, the
necessary surveys were made and plans and specifica-
tions placed on file in the office of the state highway
commission and bids were advertised for the grading
of approximately fourteen miles of the Pacific High-
way in Jackson County, extending from the California-
Oregon line, over the Siskiyou Mountains, down to
within about seven miles of the City of Ashland, Ore-
gon, in accordance with plans and specifications then
on file with the Department.   The notice to contract-
ors was given, and the proposal of the plaintiff was
accepted on the thirty-first day of January, 1914, and
the resulting contract and specifications are contained
in the record.   The contract was a standard printed
form, furnished by the state engineer.

The complaint alleges the corporate existence of
the defendants county of Jackson and United States
National Bank.   It is then alleged that on January 31,
1914, the plaintiff and the defendant county entered
into a contract in writing, which is attached to the com-
plaint, by the terms of which the plaintiff undertook
to construct a highway extending from the California
line northward a distance of approximately 14 miles,
but more particularly described in the contract as from
engineer's Station 0+00 to Station 705+.086.   The
making of this contract is admitted.   It is further
alleged that the work and material to be performed
and furnished was to be paid for by the county at cer-
tain prices named in the contract, and that for all work
other than that covered by the contract the county

agreed to pay to the plaintiff force account prices as
follows: For team, wagon and driver, $7 per day; for
common labor, $3 per day; for gang foremen, $6 per
day; and in addition thereto the sum of 10 per cent
(10%) of all sums so payable for such force account.
This allegation of the complaint is admitted. That
the work of construction commenced early in Febru-
ary, 1914, and was completed on or about March 28,
1915, but that during the performance of the work the
county abandoned that portion of the highway shown
on the plans, which were made a part of the contract
between Stations 563 and 594, and relocated that por-
tion of the highway and required the plaintiff to con-
struct such relocated portion according to a new and
different plan and by the terms of the contract the
plaintiff was entitled to receive compensation for this
work at force account prices, plus 10 per cent on the
cost of labor. That under date of February 25, 1915,
or more than a month before the work was completed,
the state highway engineer made a certain pretended
"Final Estimate" of the work performed and mate-
rial furnished by the plaintiff. The allowances of this
estimate are set out in detail in the complaint. The
complaint further alleges that thereafter the state
highway engineer made another and further estimate
or allowance to the plaintiff in the sum of $13,700, dis-
tributed as follows:

Extra for concrete culvert work at Stations
    674+90, 526+90, and 615+20.............$2,235
Extra work Siskiyou, Stations 392 to 398.......   950
Extra work Steinman overcrossing, Stations 563
    to 594.................................. 6,000
Extra work Dollarhide Crossing, Station 509.. 2,000
Miscellaneous, covering all other bills and claims
    rendered by J. W. Sweeney.............. 2,515

It is alleged that the plaintiff refused to accept the pretended estimate of the state highway engineer and protested to the defendant county that the estimate was unfair, incorrect and incomplete, and failed to include many items of work performed. That thereupon a special session of the County Court of Jackson County was held on March 20, 1915; that the plaintiff appeared before the court and protested against the pretended final estimate, and thereupon it was agreed that the estimate be set aside and that the County Court should appoint a disinterested civil engineer to reclassify and re-estimate the work performed and to determine the amount due to the plaintiff and that the county agreed to pay and the plaintiff agreed to accept the amount so to be ascertained, and that it was further agreed between the plaintiff and the county that the pretended final estimate should be held and retained by the plaintiff as a current or preliminary estimate. The complaint further alleges that the plaintiff had become indebted to the United States National Bank in a sum in excess of $35,000, and the bank demanded that plaintiff assign to it as collateral security for such indebtedness the said pretended final estimate and the moneys due thereunder, which assignment was so made by the plaintiff on April 1, 1915. That thereafter the County Court of Jackson County undertook to rescind its agreement with the plaintiff to cause the work to be reclassified and re-estimated and refused to make any appointment of a disinterested civil engineer for that purpose and now claims and insists that the pretended final estimate is correct and truly represents the amount due to the plaintiff and that the defendant bank claims and insists that the pretended final estimate so assigned to the bank as a preliminary or current estimate is a final estimate under the contract. The complaint then sets out

twenty-one specific grounds upon which the alleged final estimate is not final or conclusive against the plaintiff and should be set aside, and alleges in detail the quantities of the different kinds of material moved under the contract and the amount of pipe, concrete and other material installed on account of which the plaintiff was entitled to receive payment at unit prices under the contract on the whole line, excepting that part between Stations 563 and 594, aggregating $162,275.30.

The complaint then alleges that in the construction of that portion of the highway last above described, namely, on the entire line excepting that part between Stations 563 and 594, the plaintiff excavated 42,390.3 yards of material known as "adobe" or "sticky," for which there was no price fixed by the contract and for which plaintiff was entitled to receive a reasonable sum as compensation, which is alleged to be $0.75 a cubic yard, or a total sum of $31,792.72.

The complaint also sets out in detail the quantities of material moved and also the pipe and material placed and installed in structures on that part of the highway between Stations 563 and 594. This statement is as follows:

| Items. | Quantities. |
|---|---|
| Hard-pan | 2,133.4 cubic yards |
| Loose Rock | 4,696.3 cubic yards |
| Solid Rock | 5,037.6 cubic yards |
| "Doubie" or "Sticky" | 6,211.0 cubic yards |
| Overhaul | 46,800.0 cubic yards |
| Riprap, hand placed | 14.5 cubic yards |
| Clearing | 593.8 square rods |
| Grubbing | 60.2 square rods |
| Concrete Pipe, 12-in., in place | 186.0 lineal feet |
| Concrete Pipe, 24-in., in place | 93.0 lineal feet |
| Reinforcing Steel, in place | 35,978.7 pounds |
| Concrete Masonry, Class A, in place | 606.0 cubic yards |

That the plaintiff was entitled to receive compensation for this work and material at force account prices in the sum of $39,500.80. The complaint then alleges that the defendant county failed to furnish plaintiff proper stakes, elevations and directions for the construction of the "Dollarhide Crossing" over the tracks of the Oregon and California Railroad at Stations 509 and 510 and made such substantial changes in the location of the highway at this point and in the plans for the crossing that plaintiff was damaged in the sum of $6,172. The complaint then alleges that between Stations 392 and 398 at a point known as Siskiyou Curve changes were made in the location and plans of the highway whereby plaintiff was delayed and sustained damage in the sum of $804.

It is then alleged that at Stations 674+90, 526+90 and 615+20, the plaintiff put in place under the grade of the highway, strictly in accordance with the plans and directions of the highway engineer, certain concrete culvert pipe and that the plans of the engineer were defective and for this reason the pipe was crushed by the weight of the fill at these three points; that the engineer required the plaintiff to tunnel through the fill at these three points and construct protected concrete culverts and that the plaintiff is entitled to compensation for such work at force account prices in the sum of $3,280.

The complaint then alleges that at various places along the line of the highway not before mentioned, the highway engineer made numerous substantial changes in location and plans and failed to furnish plaintiff proper stakes, elevations or directions for constructing the highway, and plaintiff was compelled to keep a large force of men on the ground at great expense; that at all points along the line of the high-

way the highway engineer set stakes indicating the elevation of the completed roadbed and these elevations were computed by the engineer with reference to a large number of bench marks which were in many cases erroneous and not in agreement and as a result plaintiff was required to change the grade of large portions of the highway after they had been completed in accordance with such stakes and on account of such work plaintiff is entitled to compensation at force account prices in the sum of $15,344.25.

The complaint further alleges that after the roadbed had been completed in accordance with the plans and directions of the highway engineer and after the men and teams had been moved to other parts of the work the plaintiff was required to return to the roadbed so completed and reconstruct it so that at certain places the surface would be convex or "crowned," and at other places to raise one side of the roadbed to a greater elevation than the other, for all of which work there was no provision in the contract or plans and specifications; that plaintiff is entitled to compensation at force account prices for this work in the sum of $5,799.75.

The complaint further alleges that plaintiff was required by the engineer to purchase and bring upon the work certain material which was not required in the construction of the highway at a cost including transportation of the sum of $543.44.

The complaint further alleges that by the terms of the contract the defendant county was required to furnish through the highway engineer a complete, true and accurate profile map showing the location and grade elevations of the highway and the ground over which it was to be constructed; that no such profile was ever furnished as per the terms of the contract,

except a profile covering less than half of the highway, and this map was not furnished until long after the execution of the contract; that the county and its officers well knew that the ordinary and usual method of construction and the method in contemplation of the parties to the contract was by the employment of gangs of stationmen who would undertake at unit prices certain portions of the work to be allotted to them; that by reason of which plaintiff was unable to secure stationmen for a large portion of the work at unit prices, which were much less than the cost of doing the work by day labor; that plaintiff was compelled to do a large portion of the work by day labor which he could have let to stationmen and the difference in the cost and the amount of damage suffered by the failure of the county in this regard is $12,000.

The complaint summarizes the claims of the plaintiff as follows: The amount which the plaintiff was and is entitled to receive from the defendant county is the sum of $277,562.26, together with interest on all of the items set forth in the complaint, except those items claimed as damages, at the rate of 6 per cent per annum from March 28, 1915, less the amount paid by the county, namely, $156,321.22, and less such sum as should be found to be the cost of cement furnished by the county to the plaintiff.

The defendant bank answered asserting that by virtue of the assignment of the amount due as stated in the final estimate of the engineer as collateral security, in any event the county of Jackson is indebted to this defendant in the sum of $35,373.36, with interest, and that the county ought not to be allowed to allege that any less sum of money is due this defendant.

The defendant county appeared specially and moved the court to quash the service upon the county for the

reason that the same was void. That the suit was not brought where said defendant resides or was found, and the defendant United States National Bank of Portland, Oregon, is not a material or necessary party to the controversy, and that this court has no jurisdiction thereof, or over this defendant. The motion being overruled, the county demurred to plaintiff's complaint on the grounds of (1) lack of jurisdiction, (2) insufficiency of facts, (3) that the plaintiff has an adequate remedy at law. The county also demurred to the answer of the bank. The court overruled the demurrers. After demands by the county for 'a bill of items and the answers thereto, and a request for further items of amount, the defendant county answered the plaintiff's complaint, putting at issue the material allegations, specially answering each of the paragraphs of the complaint, and setting up the provisions of the contract, the issuance of the final estimate, the verification thereof by the oath of the plaintiff, the sale and transfer of such voucher from the plaintiff to the defendant bank, and an estoppel; and likewise, answered the answer of the bank, and the cause was put at issue.

The answer of the county avers *inter alia:*

"That by the terms of said contract and which is the contract above referred to in this further and separate answer, the state highway engineer referred to in said contract was required, on the completion of the work under said contract, to make a final estimate of the amount due the plaintiff. That by the terms of said contract said engineer was made an umpire whose decision upon said matter in said final estimate should be final and binding upon the parties to said contract."

The transcript of the evidence contains 2,400 pages of testimony.     AFFIRMED.

For appellant there was a brief over the names of *Mr. Alfred E. Reames* and *Mr. George M. Roberts*, District Attorney, with an oral argument by *Mr. Reames*.

For plaintiff-respondent there was a brief over the names of *Mr. Loyal H. McCarthy, Mr. S. B. Huston, Mr. Robert D. Searcy* and *Messrs. Carey & Kerr*, with oral arguments by *Mr. McCarthy, Mr. Huston* and *Mr. James B. Kerr*.

For respondent, United States National Bank of Portland, there was a brief over the name of *Messrs. Chamberlain, Thomas, Kraemer & Humphreys*, with an oral argument by *Mr. Warren E. Thomas*.

BEAN, J.—The first question presented for consideration is in regard to the motion to quash, for the reason the suit was commenced in the wrong county. It is evident that the suit is embraced within that portion of Section 396, subdivision 3, L. O. L., which enacts that:

"In all other cases, the suit shall be commenced and tried in the county in which the defendants, or either of them, reside, or may be found at the commencement of the suit."

The defendant bank is an institution of Multnomah County. This question therefore depends upon whether or not the bank was a necessary or proper party defendant. If it is, then the suit was properly commenced in Multnomah County. Section 393, L. O. L., which prescribes who may be plaintiffs and defendants, provides in part that:

"Any person may be made a defendant who has or claims an interest in the controversy adverse to the plaintiff, or who is a necessary party to a complete

determination or settlement of the questions involved therein.''

The record discloses that both the county and the bank claimed that the estimate of the amount due plaintiff was in fact final and was in the nature of an adjudication fixing the amount due the plaintiff from the county. The bank was the assignee of all of the interest of the plaintiff by virtue of the estimate. The bank insisted that the estimate could not be set aside to its prejudice; and the complaint prayed that notwithstanding the claim of the bank that a decree be entered fixing a new and correct estimate which should be paramount to any rights or claims of the bank under its assignment and that the bank be enjoined from asserting that the estimate was final and binding on the plaintiff. According to the claim made by the bank, it was the owner by virtue of the assignment as collateral security of the whole amount due Sweeney from plaintiff. Therefore, if this is correct, the bank would have had the right to have instituted an independent action upon the claim, and would not have been compelled to wait from April, 1915, until the present litigation is concluded. This interest of the bank in having the $35,573.56 paid to it instead of having the claim assigned to it, declared to be an equitable assignment of only a portion of plaintiff's demand from the county, was wholly adverse to plaintiff's interest. In order that the bank should not commence such an independent action, and that all questions involved between the plaintiff and the county might be completely settled, it was necessary to make the bank a party to the suit. If the plaintiff had proceeded against the county alone, he would probably have been met at the inception of the litigation by an objection

that the bank, because of its assignment, was a necessary party. It is the policy of courts of equity that whenever a cause is presented where judgment is sought upon a controversy between the parties before the court, to have all of the parties present, whose rights are so interwoven; whenever such parties can be brought in so as not to infringe upon the rights of those who are absent by a decree which would necessarily affect their interests, or if the presence of any such party would defeat the jurisdiction, then the court will dismiss the suit: *California* v. *Southern Pacific Co.,* 157 U. S. 229 (39 L. Ed. 683, 15 Sup. Ct. Rep. 591) ; *United States* v. *Northern Pacific R. R. Co.,* 134 Fed. 715 (67 C. C. A. 269). The demand of the plaintiff was that the alleged final estimate or award be declared to be only a partial or preliminary estimate. Under these circumstances, the bank claiming the assignment of an adjudicated claim was not a mere nominal party. If upon the trial, the final estimate should be set aside or declared not to be such a final estimate, the claim of the bank then would be in the same condition as any other preliminary estimate of unsettled account. The answer of the county to the answer of the bank denied any interest in the bank to protect and denied that the plaintiff had made any assignment to the bank, or that there was due the bank any sum whatever. The provisions of the decree, in so far as the bank is concerned, established the necessity for its presence, and that it had rights which were determined according to the contentions of plaintiff. According to the decree of the trial court, the transaction between the plaintiff and the bank operated as an equitable assignment of a part of the money due plaintiff. In the case of *Willard* v. *Bullen,* 41 Or. 25 (67 Pac. 924, 68 Pac. 422), Bullen had a contract with

the City of Portland to erect a bridge. He gave as collateral security, orders on the city to the Commercial National Bank, and others, some of which were "payable out of the final estimate," and others "payable out of the next estimate or payment due under the terms of the contract." These orders were presented to the city, but before they were paid, or a final settlement was made, suit was brought by plaintiff who claimed to be a partner of Bullen.

This court said:

"The orders in favor of the Commercial National Bank, The North Pacific Lumber Co., Kelly, Dunne & Co. and Jacobson operated as an equitable assignment of a part of the fund, and gave to these order claimants a prior right to be paid out of such fund before the general creditors."

As to an interest acquired by an equitable assignment: See *McDaniel* v. *Maxwell*, 21 Or. 202 (27 Pac. 952, 28 Am. St. Rep. 740). The rule adopted in this state in the latter case is that an assignment of a part of an entire demand is good in equity, and operates when delivered to the payee as an equitable assignment or appropriation of the fund *pro tanto*, and no acceptance by the drawee is necessary: Citing 3 Pomeroy's Equity, § 1280; *Brill* v. *Tuttle*, 81 N. Y. 454 (37 Am. Rep. 515); *First National Bank* v. *Kimberlands*, 16 W. Va. 555; *Harris County* v. *Campbell*, 68 Tex. 22 (3 S. W. 343, 2 Am. St. Rep. 467); *Hutchinson* v. *Simon*, 57 Miss. 628; *James* v. *City of Newton*, 142 Mass. 366 (8 N. E. 122, 56 Am. Rep. 692). In 4 Cyc. 103, the rule as to parties is stated as follows:

"When it appears in a proceeding in equity that the subject matter, or an interest therein, has been assigned, the assignee is a necessary party to the proceeding brought by the assignor, or against him."

1. In the determination as to whether or not there has been a proper joinder of parties defendant, it must depend largely upon the case as stated by the plaintiff in his complaint, however it may turn out upon the merits: *Rountree* v. *Mt. Hood R. Co.* (D. C.), 228 Fed. 1010. "The motive of the plaintiff," says the court in *Chicago, Rock Island & Pacific Ry. Co.* v. *Schwyhart,* 227 U. S. 184, 193 (57 L. Ed. 473, 33 Sup. Ct. Rep. 250, 251), "taken by itself does not affect the right to remove. He has an absolute right to enforce it whenever the reason makes him wish to assert the right."

The county bases its claim that the bank was not a necessary party upon decisions involving facts which are dissimilar to those in the present case. In *Allen* v. *Miller,* 11 Ohio St. 374, 376, cited by it, the question was as to whether the assignors of plaintiff who claimed no interest in the controversy adverse to plaintiff were necessary parties, and whether such assignors should be joined as defendants, the court held that they need not be so joined. In *Thompson* v. *Massie,* 41 Ohio St. 307, 317, relied upon by the county, it appeared that Thompson was sued as a joint maker of a note. It was objected that bankruptcy proceedings had been instituted against Thompson before the action was brought. The court held, nevertheless, that Thompson was the proper party to the action. In *Hadley* v. *Dunlap,* 10 Ohio St. 1, 6, cited by the county, it appeared that a resident who had no interest in the controversy was joined with a nonresident and it was held that this joinder did not prevent the removal of the case to the federal court. In *State ex rel. Jackson* v. *Bradley,* 193 Mo. 33 (91 S. W. 483, 485), also cited by the county on this point, H., J. and S. prosecuted an action as attorneys at law, and J. collected the fee;

H. sued J. to recover his share, and joined S. suing in the county where S. lived. The court said:

"The employment of Houts and Suddath, although for a contingent fee, was wholly independent of each other. H. neither has nor claims to have any rights against S., and *vice versa.*"

Questions of public policy, which would prevent the county being sued in any other forum than its own, are urged. That by bringing the suit in Multnomah County, the expense of the trial was excessive and burdensome. Section 45, Subd. 4, L. O. L., provides for a change of the place of a trial on motion of either party to the action when it appears:

"That the convenience of witnesses and the parties would be promoted by such change."

There was no application for a change of the place of the trial of which we are advised, in so far as it appears at this stage of our investigation Multnomah County was a convenient forum for the witnesses and it does not appear that it increased the expenses of the parties.

2, 3. Many causes involving claims against counties in the State of Oregon have been tried in a court other than that of a defendant county: See *Weiss* v. *Board of County Commissioners of Jackson County,* 8 Or. 529, 9 Or. 470; *Rice* v. *Wallowa County,* 46 Or. 574 (81 Pac. 358); *Ridings* v. *Marion County,* 50 Or. 30 (91 Pac. 22); *Bailey* v. *Benton County,* 61 Or. 390 (111 Pac. 376, 122 Pac. 755); *Buttle* v. *Douglas County,* 87 Or. 105 (168 Pac. 1180). After the county made a special appearance and the preliminary motions and questions were disposed of, it answered to the merits, and in any event the jurisdiction of the court over the defendant county then became complete. A party cannot fight

his battle upon the merits without making a general appearance. The law will not allow a party to obtain the benefit of jurisdiction of the court if the decree is in his favor, and repudiate it when the result is adverse. As said in *Sealy* v. *California Lumber Co.,* 19 Or. 94, at page 97 (24 Pac. 197, at page 198):

"He ought to do one thing or the other—either fight it out on the line of his special appearance; or, if he appear and go to trial, accept its incidents and consequences": *Belknap* v. *Charlton,* 25 Or. 41 (34 Pac. 758); *Winter* v. *Union Packing Co.,* 51 Or. 97 (93 Pac. 930); *Jones* v. *Jones,* 59 Or. 308 (117 Pac. 414).

4. We find that the United States National Bank of Portland, Oregon, had a claim, or interest in the fund in controversy in this suit adverse to the plaintiff; that the bank was a necessary party to a complete determination of the questions involved in this suit, and that the action was properly commenced in Multnomah County where the bank was situated.

The county's demurrer to the complaint, on the ground that the matters alleged are not cognizable in equity, raises the next question. It is the position of counsel for the county that equity has no jurisdiction for the impeaching of an award, unless the contract, by the most explicit terms, makes the engineer selected by the parties the arbiter whose judgment is final, binding and conclusive upon both parties; nor unless fraud in making the award, which was participated in by the county, is alleged and proved; nor unless the error or mistake plainly appears upon the face of the award. That the plaintiff is precluded from obtaining relief by making an assignment to the bank, and thereby accepting benefits of the award.

The provisions of this contract relating to the finality of the award of the state engineer are as follows:

"All of said work is to be done under the supervision and direction of the engineer selected by the State Highway Engineer. To be approved by him and accepted by said State Highway Engineer. Said State Highway Engineer shall have the right to fully decide on all questions arising as to the proper performance of said work, and in case of improper construction, or noncompliance with the contract in any manner, to suspend said work at any time, and to order the partial or entire reconstruction of said work, or declare the contract forfeited; and in case of forfeiture, to relet said contract and to adjust any difference of price, or the damage, if any there be, which said party of the second part shall pay to Jackson County, Oregon, on account thereof, and in all such matters the decision of said State Highway Engineer shall be final. * *

"The State Highway Engineer shall, as soon as practicable after the completion of this contract, make a final estimate of the amount of work done thereunder, and the value of such work, and Jackson County shall, at the expiration of thirty-five (35) days from and after such final estimate is to be made, and is approved by the County Court of Jackson County, pay the entire sum so found to be due hereunder, after deducting therefrom all previous payments and all amounts to retained under the provisions of this contract."

Upon the trial counsel for the county moved for a decree under Section 411, L. O. L., for the reason that the plaintiff is not entitled to the relief claimed. All of these questions thus raised are so closely allied to the determination on the merits that we pause here to read the record.

5. Having carefully read all of the testimony in the case, the next question that we deem it our duty to give our consideration is whether or not a court of equity will exercise its jurisdiction to set aside the final certificate made by the engineer, or what may be

termed an award.  A construction contract, such as the one in question in this case, which stipulates that a certain engineer is expressly clothed with the broad authority to determine all questions arising in relation to the work, and in case of improper construction or failure to comply with the contract, to suspend the work and order the partial or entire reconstruction, or to declare the contract forfeited, and in case of forfeiture, to relet the contract and adjust any difference of price, or the damage, if any, to the county on account thereof; providing that "in all such matters, the decision of said State Highway Engineer shall be final"; further providing that the engineer, after the completion of the work shall make a final estimate of the amount of work done, and the value thereof to be paid by the county; determine all disputes arising under the contract bearing upon the final settlement, and for payments to be made upon the engineer's certificate, does not create a mere naked agreement to submit difference to arbitration.  Such stipulations for arbitration are not merely collateral, but are of the very essence of the contract, and such agreement is not subject to revocation by either party, and an award made by virtue of such contract provisions, and evidenced by final certificate of the engineer, in the absence of fraud or of such gross mistake as would imply bad faith or a failure to exercise honest judgment, is binding upon both parties to the contract, in so far as it is confined to disputes actually subsisting and open to arbitration.  This is now well settled beyond controversy: *Memphis Trust Co.* v. *Brown-Ketchum Iron Works,* 166 Fed. 403, 405 (93 C. C. A. 162); *Kihlberg* v. *United States,* 97 U. S. 398 (24 L. Ed. 1106); *Sweeney* v. *United States,* 109 U. S. 618 (27 L. Ed. 1053, 3 Sup. Ct. Rep. 344); *Railroad* v. *Central*

*Lumber etc. Co.,* 95 Tenn. 538 (32 S. W. 635); *St. Paul & N. P. Ry. Co.* v. *Bradbury,* 42 Minn. 222, 227 (44 N. W. 1). In *Mundy* v. *Louisville & N. R. Co.,* 67 Fed., at page 637 (14 C. C. A., at page 587). Judge TAFT expresses the rule as to the finality of the arbitrator's decision thus:

"The authorities leave no doubt that construction contracts, in which the contractor stipulates that the engineer or architect of the owner shall finally and conclusively decide, as between him and the owner, what amount of work has been done, and its character, and the amount to be paid therefor under the contract, are legal and should be enforced. In such cases, after the work has been done, the contractor can recover nothing in excess of the amount found due by the engineer, unless he can make it appear that the engineer's decision was fraudulently made, or was founded on palpable mistake."

In *Lewis* v. *Chicago, S. F. & C. Ry. Co.* (C. C.), 49 Fed. 708, 710, the rule is stated as follows:

"The estimate may be impeached for fraud; that is to say, it may be shown that the engineers in charge intentionally underestimated or overestimated the work. It may also be impeached by proof of gross errors in the measurements and calculations. If the evidence shows such errors, it either creates the presumption of fraud, or warrants the conclusion that the engineers did not exercise that degree of care, skill and good faith in the discharge of their duty which the law exacts; and in either event the court will disregard the estimate so far as is necessary to do substantial justice."

See, also, *Elliott* v. *Missouri, K. & T. Ry. Co.,* 74 Fed. 707 (21 C. C. A. 3); *Fruin-Bambrick Const. Co.* v. *Ft. Smith & W. R. Co.* (C. C.), 40 Fed. 465, 468.

In the case at bar, it is not claimed by plaintiff that there was any intentional fraud on the part of the

county or its engineers, but that in estimating the amount of the work performed, and classifying the same, there was such gross and palpable errors that it was impossible for the result to be the exercise of an honest judgment.   Therefore the same is not binding.

6. The evidence in this case clearly shows that such mistakes were made by the force of assistants under the engineer.   The testimony in the case is entirely too lengthy to be portrayed here.   It is only fair to say that it is not the intention to in any way criticise the state highway engineer.   The difficulty appears to be, and this county is not alone in the matter, that the county after the contract was awarded to the plaintiff placed too much reliance and responsibility upon the state highway engineer without provision being made for a sufficient corps of assistants.   The state highway engineer's time and attention were demanded in various counties of the state; the real work of engineering devolved upon the district engineer who was in the office most of the time, and the engineer's work upon the road devolved upon another who in turn was compelled to rely for assistance upon men who were not thoroughly competent engineers, and did not understand the use of ordinary engineering instruments.

Having made this explanation, a general description of the method of procedure must suffice.   Plaintiff Sweeney, after executing the contract, proceeded to the scene of the works with a crew of men and his construction outfit.   In about three weeks, an engineer appeared.   In the meantime the contractor was compelled to use all of his force in clearing the right of way without commencing actual construction.   Engineering work for the construction of the road and the profiles for the work were far behind what they should have been at the time of the commencing of

the work; there was no complete survey of the line, and the location was done piecemeal, part from the north, part from the south and part from intermediate points, and at the places where these survey lines met it was necessary to resort to equations. The work of construction was practically dragging upon the heels of the engineering work, waiting for the surveys and the setting of grade stakes, and as a result there were many delays in the work, and many changes made in the plans which necessitated changes in the construction. In several places on the line of the fourteen miles of the road the location of the route was changed by means of offsets, 3.15 miles of which were made. Many changes were made from the partially completed profiles, for instance on one curve, the line was changed so as to increase the distance 16 per cent. Yet as we understand the record, the several estimates which went to make up the final estimate on March 29, 1915, were based upon and figured from the profiles without taking into consideration the changes that had been made. By the final estimate, the plaintiff was allowed a balance of $35,573.56. The plaintiff protested against the allowance as shown by the final estimate, and filed such protest with the County Court of Jackson County giving many reasons therefor in detail, and claiming a balance of $82,986.11, for the work upon the highway. The final estimate was signed by plaintiff under protest. There was never an acceptance of the final estimate by Sweeney in settlement or satisfaction of his demand against the county. The assignment by Sweeney of the amount allowed to the bank as collateral security was only a partial assignment of his claim against the county. It was an equitable assignment. The defendant county was not prejudiced thereby in any manner. The inter-

est of the bank can be appropriately adjusted and protected in a suit in equity. An action at law would not afford an adequate remedy.

7. We attach no particular significance to the fact that plaintiff verified the final certificate by a statement to the effect "that the work was actually performed and the material furnished as therein charged"; and there is due according to the contractor the sum of $35,573.56, and that the same has not been paid. This verification is in no way inconsistent with plaintiff's claim in this suit. He not only claims the amount stated in the final certificate, but considerably more. This did not change the nature of the final certificate. On account of the various errors entering into the final adjustment indicating a want of the exercise of that degree of care, skill and good faith which the law exacts under the rule stated by the authorities above noted, and many more which might be added, the final estimate should be set aside and corrected.

8. The contract for the construction of the highway named the state highway engineer with reference to his official position. It is shown by the evidence that the final estimate signed by that official did not represent his judgment as to the amount of work performed or the classification thereof, but was based wholly upon reports from his subordinates. The contract gave to the state highway engineer the power of naming those subordinates. No provision appears to have been made for any hearing before the highway engineer or before his assistants; none appears to have been had except the rather summary proceeding when Mr. Bowlby devoted about two hours to the examination of some 2,000 force bills. A fair basis for the estimate or award on account of the many inaccuracies and mistakes shown by the testimony was lacking.

The proceedings and grounds were wanting which give
to an ordinary common-law arbitration and award its
binding effect.   The final estimate assailed in this suit
is merely *prima facie* correct.   The duty of a court of
equity as in all such cases is to so decide as to mete
out substantial justice, and if upon all the evidence it
appears that the estimate is not fair, that the plain-
tiff has not enjoyed the privilege every man is entitled,
to, namely, an impartial hearing and determination, but
that it appears as in this case that the estimate is based
upon reports of incompetent subordinates and is
grossly erroneous, then it is the duty of the court to
set aside the final estimate and institute an independ-
ent inquiry as to the amount of compensation which
the plaintiff has earned, and is justly entitled to under
the contract.   The testimony in the case is ample to
bring the same within the requirements of the authori-
ties above referred to.   The plaintiff failing to obtain
a satisfactory settlement with the defendant county
solicited the services of G. A. Kyle an eminent and
experienced engineer who took to his assistance Harry
Kyle and Douglas Kyle, two other experienced en-
gineers, and also other assistants, and obtained the
data available to assist them from the county en-
gineers, particularly a copy of the cross-section book
of the survey made by the county engineers with the
engineer's notes, and cross-sectioned a large part of
the work taking the center of the road as constructed
for the center line, and made many remeasurements;
calculated the amount of material removed and work
done the entire length of the road, except where force
account was claimed, and also made a reclassification
of the material so moved.   In doing this, the testimony
shows that they found about 90 per cent of the stakes
which had been set by the county engineers, and many

bench-marks. They devoted about 48 days, May 23 to July 10, 1915, in the prosecution of this work. They also had the assistance of a competent and experienced engineer, Mr. H. S. Houston, in the reclassification of the material. All of these engineers testified upon the trial, giving the result of their investigation.

The total yardage not including the work designated as the
Steinman crossing being.......274,173.90 cubic yards
The total number of cubic yards
    of the excavation as shown
    by the county engineers
    was .....................257,469.89

The amount of estimate of Kyle
    and Houston being........ 16,704.01

—in excess of the total yardage allowed by the county engineers.

The trial court set aside the award made by the highway engineer and adopted the amount of excavation as fixed by the engineers for the county, and adopted the classification of the material excavated as estimated by the plaintiff's engineers. Taking the Kyle and Houston estimate of the total without disturbing the figures of the other classifications and computing the same as common excavation at the price thereof, 29 cents per cubic yard, makes $4,844.16, which should be allowed plaintiff in addition to the amount allowed by the trial court.

The county employed a skilled engineer to examine the highway and in company with the resident highway engineer devoted two days in checking the classification that had been made by the resident highway engineer. This was about two years after the completion of the work, and at a time when several sec-

tions of the road were covered with snow, and it was impossible for the engineers to make definite calculation as a basis. The lists and tables made by Kyle and Houston and their assistants were checked and tested by the skilled engineers employed by the county, and one error was found in the computation of a cross-section amounting to about 4 per cent. The test so made stabilizes the Kyle and Houston estimates. For delays and changes in the construction of the highway necessitated and required by the county engineers other than those allowed by the lower court, the evidence strongly sustains the complaint as found by the trial court, and in addition thereto much more than the amount here allowed. The interest on the amount found due is disallowed for the time prior to the date of the decree of the lower court under the rule announced in *Sargent* v. *American Bank and Trust Co.,* 80 Or. 16, 39 (154 Pac. 759, 156 Pac. 431). The plaintiff did not perfect an appeal. In support of such allowance here made, let us take a small portion of the testimony as a sample, for instance, that relating to the Dollarhide Overhead bridge crossing the railroad. A statement prepared from the daily labor and material reports showing the approximate cost of this bridge is as follows:

| | | |
|---|---:|---:|
| Labor | $5,139.10 | |
| Teams | 2,478.38 | $ 7,617.48 |
| Ten per cent | | 761.75 |
| Material | | 7,074.88 |
| Total | | $15,454.11 |
| Allowed on estimate (K. and H.) | | 9,282.61 |
| Leaving a balance | | $ 6,171.50 |

The difficulties encountered by plaintiff in the construction of this bridge are detailed about as follows: The construction was commenced on May 11, 1914, and it required until November to complete it. After its completion the railing built according to the plans failed and it was necessary for plaintiff to return and construct a new railing. At the beginning, the engineers failed to give the final depth of excavation and plaintiff was required to continue the excavation for the abutments and piers after the depth first designated was reached. The location of the piers was changed twice before completion. After the east abutment was well under way a general change was ordered and the angle or "skew" as called by the witnesses, at which the bridge crossed the railroad was changed. Lumber was brought upon the ground and some of the forms were constructed and put in place and the pouring of concrete was undertaken when the whole plan of the bridge was changed. The center span being lengthened three feet and the other spans shortened. When the forms were built in accordance with the revised plan there were no details for the girders and beams, and after these were furnished another change was made. Plaintiff was directed by the county engineer to: "Add one inch to length of each girder on account of 6 per cent grade." After the bridge was well along toward completion it was discovered that insufficient clearance over the railroad tracks was afforded and it became necessary therefore to change the girders. On October 7, 1914, the contractor was required to change a girder by cutting 11 inches, and the other girders were also changed. These changes necessarily resulted in delays and expense and the change in the form of the structure materially affected

the kind and quantity of material to be used. The angle at which the bridge crossed the track was made more obtuse and this naturally lengthened the structure and the increase of lateral clearance on the center span resulted in changes in material, bills for which had been made up in accordance with the original plan. The changes required more material and also the cutting of the steel in lengths to conform to such changes. The girders, weakened by the change in order to give greater vertical clearance, required additional reinforcement. The steel in the piers had to be spliced. A reinforced concrete railing on both sides of the bridge was called for. The specification for such reinforcement consisted of wire only one eighth of an inch in diameter. The plaintiff's foreman protested against this as insufficient, but the plans were followed with the result that the vibration from passing trains cracked the railing and necessitated its being rebuilt. Plaintiff was not furnished with sufficient plans. The only plan of the bridge actually constructed as stated by Mr. Bennett, county engineer on the work (page 2213), was prepared after the bridge was completed. The county engineers allowed extra for this bridge, $2,000, which the trial court approved. We think to this should be added $3,622.84, as additional damages on the Dollarhide bridge, being a portion of the balance of the actual cost which should be allowed plaintiff for this bridge and other similar delays claimed in the complaint for which no provision has been made, making the revised estimate of the court as follows:

| | Total. | Less Steinman Sec. | Final. | Unit Prices. | Amount. |
|---|---|---|---|---|---|
| Earth, cu. yds. | 21,427.82 | | 21,427.82 | @ .29 | $6,214.06 |
| Hard-pan, cu. yds. | 55,566.90 | 1,367.7 | 54,199.20 | @ .35 | 18,969.71 |
| Loose Rock, cu. yds. | 70,357.04 | 3,240.7 | 67,116.34 | @ .38 | 25,504.20 |
| Solid Rock, cu. yds. | 98,655.01 | 3,901.4 | 94,753.61 | @ .78 | 73,907.82 |
| Adobe, cu. yds. | 42,785.93 | 6,109.0 | 36,676.93 | @ .75 | 27,507.69 |
| Clearing, sq. rds. | 16,146.40 | 593.8 | 15,552.60 | @ .50 | 7,776.30 |
| Grubbing, sq. rds. | 4,067.60 | 60.2 | 4,007.40 | @ 1.40 | 5,610.36 |
| Riprap, loose, cu. yds. | 2.00 | | 2.00 | @ 1.00 | 2.00 |
| Riprap, h'd-placed yds. | 141.20 | 14.5 | 126.7 | @ 1.50 | 190.05 |
| Overhaul, cu. yds. | 106,791.00 | 48,800.0 | 59,991.0 | @ .01 | 599.91 |
| Bubble masonry, cu. yds. | 144.70 | | 144.70 | @ 8.00 | 1,157.60 |
| Concrete, Class A. yds. | 1,519.88 | 606.0 | 913.88 | @ 11.00 | 10,052.68 |
| Concrete, Class C. yds. | 111.13 | | 111.13 | @ 10.00 | 1,111.30 |
| Reinforced Steel, in place, lbs. | 89,523.34 | 35,978.7 | 53,644.64 | @ .06 | 3,212.69 |
| Porous Tile in place, 4-in., lin. ft. | 467.00 | | 467.00 | @ .15 | 70.05 |
| Con. Cul. pipe in place, 12-inch, lin. ft. | 4,472.00 | 186.0 | 4,286.00 | @ .72 | 3,085.92 |
| Corr. Iron pipe in place, 12-inch, lin. ft. | 1,741.00 | | 1,741.00 | @ 1.05 | 1,828.05 |
| Con. Cul. pipe in place, 24-inch, lin. ft. | 887.00 | 93.0 | 794.00 | @ 2.00 | 1,588.00 |
| Damages—Dollarhide and other delays | | | | | 5,622.84 |
| Damages—Siskiyou Curve | | | | | 803.95 |
| Steinman Section—Force Account | | | | | 39,550.80 |
| Three broken culverts—Force Account | | | | | 3,280.00 |
| Misc. Force Account, $7,348.99 less $908.90 on Steinman Section | | | | | 6,440.09 |
| Material not used | | | | | 543.44 |
| | | | | | $244,629.51 |
| Less cement | | | | | 5,775.09 |
| | | | | | $238,854.42 |
| Paid | | | | | 156,321.22 |
| Balance due | | | | | $ 82,533.20 |

—with interest at the rate of 6 per cent per annum from April 27, 1917, until paid.

9. Plaintiff claimed and was allowed compensation at force account prices for the work between Stations 563 and 594, known as the Steinman Section, and the defendant county complains. We do not understand that any serious controversy exists with respect to the facts relating to this portion of the work. The testimony shows that as to the grading no opportunity was afforded plaintiff to perform the same according to his contract during the summer months of 1914, when the work was contemplated to be done. The line of these sections of the highway was located adjacent to the right of way of the railroad company and during the whole of the summer a controversy was waged with the company as to the extent to which an encroachment would be permitted on the right of way. On July 31st, Mr. Bennett wrote to Mr. Sweeney advising him that they had agreed to discontinue all work on the S. P. right of way for a week or ten days, until the railroad engineers could prepare and forward maps and plans showing what part of their right of way they would allow the county to use. About October 11th, they started in to relocate the line of the highway, but there was a relocation after that. Mr. Bennett, the county engineer, said (see page 1192) that there were three or four changes between these stations; changes in the grade and numerous culvert changes were made between these stations so that it was not possible for plaintiff to undertake this work until in the month of October. The first plan of the bridge was dated 1913, and called for only two spans, the constructed bridge consists of three spans. The style of the bridge was not determined until October

8, 1914, when a plan was delivered to plaintiff which appears to be insufficient as a working plan. The estimate in the contract of Class "A" concrete was 593 cubic yards, while the final estimate shows 1,519.88 yards. By the county requiring the grading to be done in the winter months, disastrous results were caused. It was necessary to move 6,211 yards of adobe according to the estimate between these stations, and it is agreed that it is practically impossible to move this material during the rainy season. The grading between these stations could not be finished until the bridge was complete, as part of the material excavated had to be hauled from the north side of the bridge to make a fill on the south side. The same mistake, as to clearance, appears to have been made in the plan for the Steinman bridge that was made by the engineers on the Dollarhide bridge. Owing to delays on the Steinman bridge in mixing and pouring the concrete in freezing weather, elaborate precautions had to be taken to prevent damage from frost. This was required by the county engineers. It appears that it was necessary for the plaintiff to heat the water and the gravel and maintain a watchman to keep the fires going as a protection against frost. The contract required the work to be completed September 1, 1914, but the right of way between these stations was not secured, nor the plans of the bridge furnished until about five weeks after that date. The changes in this bridge were so radical that it cannot be successfully maintained that such a structure as completed was within the contemplation of the parties when they made the contract: 9 C. J., § 73, p. 734. See *Hayden v. Astoria*, 74 Or. 525 (145 Pac. 1072). A similar situation as is here presented was before the court in

*Indianapolis Northern Traction Co.* v. *Brennan,* 174 Ind. 1, 24 (87 N. E. 215, 223, 30 L. R. A. (N. S.) 85). The court there said:

"The contract under which they were obligated required that all of the work which they had contracted to perform should be completed by August 15, 1903. Certainly, when appellant company obligated these parties to do and finish the work within a fixed period, it was its duty to afford them a fair and reasonable opportunity to begin and complete the work; or, in other words, under the mutual contract entered into between it and them, it became its duty to furnish the required material, secure the right of way, and have the road grade in readiness, as required by the contract, so that appellees, in the exercise of reasonable diligence, might begin and finish the work within the prescribed period without being subjected to unreasonable cost or expenses on account of the default, delays, and hindrance of appellant. Its default or failure in these respects would subject it to liability for whatever damages appellees might reasonably sustain on that account. * * " Citing *"French* v. *Cunningham,* 149 Ind. 632, 637 (49 N. E. 797), and authorities there cited; *Louisville etc. R. Co.* v. *Donnegan,* 111 Ind. 179 (12 N. E. 153); *Lewis* v. *Atlas etc. Co.,* 61 Mo. 534; *Minneapolis Mill Co.* v. *Goodnow,* 40 Minn. 497 (42 N. W. 356, 4 L. R. A. 202); *Mississippi River Logging Co.* v. *Robson,* 69 Fed. 773 (16 C. C. A. 400)."

See, also, *Salt Lake City* v. *Smith,* 104 Fed. 457 (43 C. C. A. 637).

The contract in question in the present case stipulates in regard to extra work as follows:

"The contractor shall do such extra work and furnish such materials as may be required by the State Highway Engineer for the proper completion or construction of the whole work herein contemplated; * * The contractor shall receive for such extra work the actual cost of all materials furnished by him as shown

by his paid vouchers. For such labor and teams as are necessary he shall receive the current prices in the locality, which shall have been agreed to in writing by the engineer and by the contractor, plus ten (10) per cent.''

By this stipulation the parties fixed a certain rate of payment for extra work of this character, thus avoiding the question as to ''reasonable value.'' This construction of the contract by the parties is borne out in making and receiving payment at force account prices for similar extra work as that performed between Stations 563 and 594. The proof sustains the claim made by plaintiff both as to material and labor. The bridge as constructed and the work done between these stations was entirely different from that contemplated by the contract in the first instance. The stipulation made a part of the contract that the state highway engineer during the progress of the work might by giving written notice to the contractor, alter any of the *details* of the construction in any manner that might be found expedient or suitable without invalidating the contract, relates as the language suggests to details, or proportionally small changes as when necessary to the construction of the contemplated bridge, and not to an entire change of the plan or time for the construction thereof. The stipulation in the contract that:

''The contractor shall receive for such extra work the actual cost of all materials furnished by him as shown by his paid vouchers. For such labor and teams as are necessary he shall receive the current prices in the locality, which shall have been previously agreed to in writing by the Engineer and by the contractor, plus ten (10) per cent''

—makes applicable the agreement made by the parties

in regard to force-account prices above quoted. The contract having provided for such a contingency, it is unnecessary to resort to proof of the reasonable value of the work. We approve the finding of the trial court as to the allowance of the work on the Steinman section.

The contractor furnished to the agents of the county statements of the force account work claimed by him, substantially as provided for in the contract. Some of these claims were allowed by the county engineers. The plaintiff was not at all times informed as to what items were allowed and what were disallowed, so that when the defendant county demanded of plaintiff a statement of the various items claimed by him, its agents were in possession of the same detailed information or more than plaintiff. Therefore, it was not erroneous for the trial court to deny an order requiring a further presentation of such items under the circumstances of this case. As the trial of the case progressed, counsel for the defendant county were furnished with the various lists of estimates and information as to the surveys and engineering work of the plaintiff's engineers, and were permitted access to the books of account and other records of plaintiff so as to facilitate a fair trial of the cause.

In the construction of the highway, the plaintiff encountered material known as "adobe," "gumbo," or "sticky," which it is claimed on his behalf was not covered by the contract and should be paid for on a basis of a reasonable value, under the rule in *Indianapolis Northern Traction Co.* v. *Brennan,* 174 Ind. 1 (87 N. E. 215, 228, 90 N. E. 65, 68, 91 N. E. 503, 30 L. R. A. (N. S.) 85); *Holm* v. *Chicago, M. & P. S. Ry. Co.,* 59 Wash. 293 (109 Pac. 799).

10. The determination of this question depends upon the classifications made in the contract. The material mentioned in the contract is comprised under the heads Earth, Hard-pan, Loose Rock, Solid Rock, Shell Rock and Solid Rock Borrow. Earth will include clay, sand, loam, gravel and all hard material that can, in the opinion of the engineer, be reasonably plowed, and all earthy matter or earth containing loose stones or boulders intermixed, and all other material that does not come under the classification of hard-pan, loose rock, solid rock, shell rock and solid rock borrow.

11. ''Hard-pan'' will include material, not loose or solid rock, that cannot, in the opinion of the engineer be reasonably plowed, on account of its own inherent hardness. It is the position of the engineers of the county that adobe comes within the classification of ''earth'' according to the contract, but in the allowance of accounts a portion of this material was classified as hard-pan.

12. It is shown by the evidence that adobe cannot be reasonably plowed. This would seem to bar it from the classification of earth. Strictly speaking, of course, it is part of the earth, but it appears to us that in the printing of the contract, and the execution of the same, this class of material was not within the contemplation of the contracting parties, and was not provided for by the terms of the contract. When we take into consideration that in the Siskiyou Mountains where this road is located, there are many kinds of material encountered, such as lava formation, it is not at all strange that the provision should have been omitted from the contract. Neither does the ''gumbo'' come within the specification of hard-pan which ''on account of its own inherent hardness'' cannot be

plowed. It appears from the evidence that adobe in its natural state cannot be successfully blasted or plowed, but to use the description given it had to be "dug out" as best it could be. It is shown that during the wet season it is very difficult to handle adobe on account of its being so sticky, and when it has dried it is nearly as hard as rock, and that a reasonable compensation for excavation of this material is seventy-five cents per cubic yard. The plaintiff having contracted to construct the highway which necessitated the excavation of the material known as adobe, and no price being agreed upon therefor, the law fixed the price at its reasonable value. It appears to have been partially conceded by the engineers for the county that adobe was not provided for by the contract by a portion of this material being classified as hard-pan. This was not an equitable classification, the unit price of hard-pan being less than one half the actual cost of moving adobe. While it may not be impossible to plow adobe, the testimony clearly shows that it is not practicable to do so. In *Indianapolis Northern Traction Co.* v. *Brennan,* 174 Ind. 1 (87 N. E. 215, 228, 90 N. E. 65, 68, 91 N. E. 503, 30 L. R. A. (N. S.) 85), the court in considering the contract specifications said:

"The term 'plowed' was certainly used in its usual meaning, and must have been so understood by the parties. They did not mean or intend thereby the mere 'rooting-up' of the material or cutting a very shallow furrow, or such plowing as would require men to ride upon the whiffletree and upon the plow beam in order to keep the nose of the plow in the material which was attempted to be plowed."

This language is particularly applicable to the material in question as described by the witnesses. The

finding of the trial court in this respect was reasonable and equitable, and we approve the same.

As to the correctness of the final estimate as the determination of the quantities and kinds of material to which the unit prices fixed by the contract were applicable, it seems plain that unless Mr. Bowlby, the highway engineer, and Mr. Kittredge, his assistant, had reliable data to determine quantity and classification, the estimate must of course lose the benefit of any presumption in its favor. The contract provides that "all grading shall be done and estimated by the cubic yard." The obvious purpose of this provision was to insure payment to the contractor for the actual quantities and not for any theoretical quantities excavated by him. The measurements of the county engineers were largely the theoretical contents of the road prism as it was expected the excavation would take place. The lateral lines of the excavation were assumed by the county engineers on the hypothesis that material of a certain character allowing a certain slope line would be encountered when the excavation was made. Of course whenever a different kind of material was encountered, the actual slope line was necessarily either flatter or steeper, and the theoretical contents of the road prism did not represent the actual excavation. The practice of employing offsets in case of line changes adopted by the county engineers resulted as follows: Whenever an offset was employed on a curve, the theoretical contents of the excavation did not correspond with the actual excavation, the line being lengthened or shortened, and the distance between cross-sections thereby affected.

We have carefully read the evidence and examined the case from many angles, which time and space for-

bids a lengthy statement in regard to.    There was no
error in the trial court refusing to dismiss the suit at
the close of the introduction of testimony, or in ren-
dering the decree.

With the change in the figures above mentioned, the
decree of the lower court is affirmed.

                    AFFIRMED.    REHEARING DENIED.

MOORE, J., absent.

---

Denied July 15, 1919.

PETITION FOR REHEARING.

(182 Pac. 380.)

On petition for rehearing.    DENIED.

*Mr. Alfred E. Reames* and *Mr. George M. Roberts,*
District Attorney, for the petition.

*Mr. Loyal H. McCarthy, Mr. Samuel B. Huston* and
*Messrs. Carey & Kerr,* for plaintiff and respondent.

*Messrs. Chamberlain, Thomas Kraemer & Humph-
reys,* for defendant and respondent.

In Banc.

BEAN, J.—Acknowledging our appreciation of the
assistance rendered by the briefs of able counsel upon
both sides of this suit, we note that it is earnestly
urged upon a petition for rehearing that the court
erred in affirming the decree of the trial court for the
same amount as there decreed by reason of the fact
that this court arrived at its conclusion by a different
process from that followed by the trial court.

13, 14. Our former memorandum in this case indicates that plaintiff not having appealed from the decree of the lower court, we could not, if the testimony warranted, find for plaintiff in any greater sum than the decree appealed from. We do not think that the appellate court in the consideration of the case under Section 556, L. O. L., which provides for a trial *de novo* upon the transcript, and the evidence is confined to or would necessarily follow the same path of the trial court, or be governed by the same reasoning, or make the same figures in computing the amount due as made in the decree appealed from. The language of the opinions of this court heretofore rendered does not confine a review upon an appeal in an equity suit within such strict limits. In *Powers* v. *Powers,* 46 Or., at page 481 (80 Pac., at page 1059), former Justice BEAN uses the following language:

"Much of appellant's brief is devoted to a discussion of the question whether the findings of fact of the trial court are supported by the evidence. Under our statute, on an appeal from a decree in a suit in equity, the cause is tried *de novo* upon the transcript and evidence accompanying it, and a final decree rendered here, without reference to the findings or conclusions of the trial court."

In *Gentry* v. *Pacific Livestock Co.,* 45 Or., at page 236 (77 Pac., at page 116), the same learned justice said:

"Under our statute, on an appeal from a decree in a suit in equity, the case is tried *de novo,* and a final decree entered by the appellate court, without reference to the findings of fact or conclusions of law of the trial court."

Whatever our view may be in regard to the evidence in the case as to the amount, we confine the same to the

amount found by the trial court. We arrive at the same conclusion as the trial court by a different route, and know of no decision in this state that restricts or hinders such a trial *de novo*.

In the short time of thirteen years that the writer has been engaged on this end of the line of work, a more solid record of material testimony, either of such volume or of any length, has never been examined. We were pleased to give it our best thought and most careful attention, employing all the time necessary. This we are aware is not indicated by the memorandum opinion.

15. Counsel for the county maintain with considerable zeal

"That if the court shall set aside the award of the highway department, and make a new award, the burden of proving the items upon which such award must be based, rested upon the plaintiff. * * That no evidence whatever of a substantive nature was ever introduced to substantiate a single item of such account," referring to "force account."

This important question was called to the attention of the court at the oral argument of the case, and commented upon by the respective counsel. The length of the record practically precludes a discussion of every point in the case. If we take this one which is so ably and strenuously contended for on behalf of the county, it will illustrate the others to a certain extent.

Referring, first, to some of the issues made in the pleadings relative to the force account work which are illustrative of the remainder, we find in paragraph XVII of the complaint the following:

"That at a certain other point on the line of said highway between Stations 392 and 398, heretofore known and referred to between the parties as the

'Siskiyou Curve,' the said State Highway Engineer made certain substantial changes in the location of said highway and certain substantial alterations in the plans thereof, and in making such changes and alterations failed to furnish to the plaintiff proper stakes or elevations or directions for constructing that portion of said highway, and plaintiff was compelled by direction of said State Highway Engineer to keep a large force of men on the ground at great expense waiting for directions as to the manner of doing such work, and by reason of such changes, alterations and delays, plaintiff suffered damages in the sum of $804.

"That at Stations 674+90, 526+90, and 615+20 of said highway, the plaintiff put in place, under the grade of said highway, strictly in accordance with the plans and specifications and under the direction of said State Highway Engineer certain unprotected concrete culvert pipe. That the plans providing for the use of such pipe at said three points were defective for the reason that the pipe specified by the said State Highway Engineer for such use was not of sufficient strength to support the grade of the highway constructed thereover, and said pipe at each of said three points was crushed by the weight of the fill placed thereon. That thereupon, and after the said fill was so completed, the said State Highway Engineer directed and required the plaintiff to tunnel through the said highway fill at said three points and construct therein and thereunder at each of said three points a protected concrete culvert. That the work of constructing said three protected concrete culverts was exceedingly expensive on account of the fact that the fill at said points had been completed. That plaintiff was entitled to compensation for constructing said culverts at the prices for force account work so agreed upon between the parties, and at said prices, together with the cost of the material used in such construction, plaintiff is entitled to compensation in the sum of $3,280."

The next paragraph XIX, is as follows:

"That at various other places along the location of said highway, not hereinbefore described, the said State Highway Engineer made numerous substantial changes in the location of said highway and numerous substantial changes in the plans thereof, and in making such changes and alterations failed to furnish to the plaintiff proper stakes or elevations or directions for constructing said highway at such points, and plaintiff was compelled by directions of said State Highway Engineer to keep a large force of men on the ground at great expense, waiting for directions as to the manner of doing such work. That at all points along the line of said highway the said State Highway Engineer caused stakes to be set indicating the elevations of the completed road bed of said highway and said elevations were computed by said Engineer with reference to a large number of bench marks which the said Engineer had caused to be established along the line of said highway, and which bench marks the said Engineer represented to the plaintiff were in agreement one with another. That the said bench marks were in a large number of cases erroneous and not in agreement one with another, and as a result the grade stakes so set for the finished road bed were erroneous and the plaintiff was therefore required and directed by the said Engineer to change the grade of large portions of said highway after they had been completed in accordance with said stakes.

"That the plaintiff was entitled to compensation for performing the work described in this paragraph at the prices so agreed upon between the parties for force account work and at said prices, plaintiff is entitled to compensation in the sum of $15,344.25."

In paragraph XXI, it is alleged as follows:

" * * That in accordance with the terms of said contract plaintiff delivered to the defendant County of Jackson on or before the 15th day of each calendar month bills for all the force account work above de-

scribed performed during the preceding calendar month.''

Paragraph XVII is answered in paragraph XIII of the answer as follows:

''That as to the allegations of paragraph XVII of the complaint, this defendant denies that at a certain, or any, point on the line of said highway between Stations 392 and 398, designated in the complaint as Siskiyou Curve, or elsewhere, the State Highway Engineer made certain substantial, or any, changes in the location of said highway, or certain, or any, alterations in the plans thereof or that in the making of such, or any changes or alterations, failed to furnish the plaintiff with proper stakes or elevations or directions for constructing that or any portion of said highway, or that the plaintiff was compelled by direction of said State Highway Engineer to keep a large, or any, force of men on the ground at great, or any, expense, waiting for directions as to the manner of doing the work, or for any reason, or by reason of any such changes, alterations or delays the plaintiff suffered damage in the sum of $804, or any other sum, or otherwise, than as hereinafter alleged.''

With a further answer which reads:

''Further answering the allegations of Paragraph XVII of the complaint, relating to work at the Siskiyou Curve this defendant alleges that the plaintiff did suffer some loss at said point due to changes in location and which were unavoidable, but within the terms of the contract, and for all extra work performed by him he was allowed force account therefor amounting to $154.38, and in the final estimate hereinafter referred to he was allowed under the head of 'Extra Work Siskiyou Station' the further sum of $950, which was allowed to, and did, include all of the claims and demands of plaintiff in said Paragraph XVII and all damages sustained by him by reason of any changes, alterations or delays at said Station and was intended to and did cover every demand on account of any of

the matters alleged in said Paragraph XVII of the complaint.''

Paragraph XIX is answered as follows by Paragraph XV:

''As to the allegations of paragraph XIX of the complaint, the defendant denies that at various other places along the location of said highway, not specifically described in the complaint, or elsewhere, the said State Highway Engineer made various substantial, or any, changes in the location of said highway or numerous substantial, or any, changes in the plans thereof, except as hereinafter alleged, or that in the making of any changes or alterations, failed to furnish the plaintiff with proper stakes or elevations or directions for constructing said highway at such points, or that plaintiff was compelled by direction of State Highway Engineer to keep a large, or any, force of men on the ground at great, or any, expense waiting for directions as to the manner of doing such work or for any other reason; denies that the bench marks mentioned in said paragraph XIX of the complaint were in a large, or any, number of cases erroneous or not in agreement with one another, or that as a result the grade stakes so set for the finished road bed were erroneous, or that they were at all erroneous, and denies that the plaintiff was, therefore, or at all directed by said Engineer to change a large portion of said highway after the same had been completed in accordance with said stakes, or otherwise, except as hereinafter alleged; denies that the plaintiff was or is entitled to compensation for performing the work described in said paragraph at force account prices or at any other prices than those specified in the contract, or that at said prices, or at all, the plaintiff is entitled to compensation in the sum of $15,344.25, or any other sum, or at all, except as hereinafter alleged.''

The allegation as to delivering to the county on or before the fifteenth day of each calendar month, bills

for all of the force account work performed during the preceding calendar month as alleged in paragraph XXI is denied.

Of course, no one contends but that the burden of proof is upon the plaintiff. The important question is: Has he borne the burden?

Our notes made when reading the testimony obviate the necessity of again perusing over two thousand pages of typewritten testimony. Referring to them, thence the record, we find at page 148 et seq. of the transcript of testimony that Mr. Sweeney, the plaintiff, when a witness in his own behalf, was interrogated upon cross-examination in regard to having all his books of account at the beginning of the trial. He answered as follows:

"I expect from our records it could be worked up but it would take a long time to do it. You must remember too that I am a little short of money, I don't want to go out and hire a lot of auditors and so on to do this."

To the question:

"But when you filed the complaint and made your demand under a certain paragraph of your complaint for fifteen thousand three hundred and forty-four dollars, under paragraph 19 of your complaint,—before you could swear to this complaint, swear to your complaint making up those items you had to know it was correct?"

—he answered:

"The bills had all been furnished; we have a duplicate of those bills."

—meaning, as we understand the record, that the bills for the force account work under the contract stipulating the prices had been furnished to the county.

Frequent reference is made throughout the record to bills for "force account" work.

At page 648 et seq., of the testimony, referring to an item of force account, to the question:

"What was the amount of the work performed at force account in your opinion, or according to your best recollection?"

—he answered: "It was $52.50."

Whereupon counsel for the county propounded the following:

"Let me ask you, Mr. Sweeney, a question right there. Mr. Sweeney, you wouldn't be able to testify to that except by looking at this tabulated statement (Plaintiff's Exhibit 90) that you have in your hand would you,—you don't know that from your independent recollection?"

To which the witness answered:

"I know about the work being done. I know where the work is, and I know about the work being done, but as to the amount, I wouldn't know, but I know there was work done there. * *

"Q. In other words, this testimony that you are giving here is just what you take off of that tabulated statement there that counsel handed you?

"A. A lot of it,—I could tell the circumstances connected with the work, and a lot of it I couldn't remember the details of it because it is quite a little while ago and there were a lot of changes being made and I couldn't possibly keep track of all of them over fourteen miles of work. But, in a general way I knew about them and I have specifically talked over those things with the time keeper and the foreman and given them my idea of what their force account work was and that sort of thing.

"Mr. Reames: But as to the amount of the labor on these different jobs, you don't know that, and you wouldn't know that unless you read it off of this exhibit that you have there, would you?

"The witness: No, sir.

"(Further questions by Mr. Kerr.)

"Q. Have you examined in the last few days, Mr. Sweeney, the copies of the force bills rendered under your direction which are on file in your office covering these items in this Plaintiff's Exhibit '90'?

"A. Yes, sir.

"Q. Do these force bills and this recapitulation of the force bills recall to your mind any recollection of any work having been done on this highway with respect to excavating below water?

"A. Well, of course, it was called to my attention and I knew it was done at the time it was done, and where it was done about,—well it was at a box culvert down on Dollarhide,—Mr. Dexter was in charge of that work,—it was the first box culvert on the line.

"Q. Well, why did you think it was force account instead of work under the contract?

"A. Well, it was under water and we always figure that work under water is something that is usually paid force account for,—as a matter of fact because it wasn't in the contract as far as I could see, and it is something special,—and the cost is a little more money than ordinary excavation."

The testimony proceeds:

"Q. What is the next item on this Plaintiff's Exhibit '90'?

"A. Well, retaining walls in under culverts, that was fixing up around the walls.

"Q. And what culverts?

"A. At this same culvert.

"Q. And why do you think that was properly chargeable to force account?

"A. Well, from the fact that they had to get some material you know, rock and stuff like that to fix up under the wall.

"Q. You remember that work being done?

"A. Yes, sir.

"Q. What was the next item on this Exhibit '90' in this segregation?

"A. Well, that is the moving cement at station 507, that is up at the Dollarhide Bridge,—that was something in the nature of a tent and cement being in the roadway and having to be moved.

"Q. Do you remember it being moved?

"A. Yes, sir.

"Q. And what is the next item?

"A. The next item is for retrimming slopes and borrow from slopes.

"Q. What do you remember about that?

"A. Well, I remember we done a lot of retrimming, quite a lot of retrimming of those places, and we borrowed from slopes. I presume that was up there on the Dollarhide Work, there was a borrow from some slopes there.

"Q. Under whose orders was that work done?

"A. Well, under the engineer's orders.

"Q. And why did you cause it to be billed as force account?

"A. Because that certainly was extra work, it was extra work for us.

"Q. Why was it extra work?

"A. Because you trim a slope down and then after you have gone, you have to come back and retrim it again,—trimming a slope is a little more expensive because it has to be trimmed to make a kind of a nice appearance, and it costs a little money to do that if you have to go and retrim it again, why you just have to spend that much more extra money.

"Q. Why did you charge borrow from slopes as force account?

"A. Well, I suppose we had to go and borrow to get material, I suppose to make the road bed.

"Q. And if you borrowed would it be necessary to retrim that slope?

"A. Well, that particular slope I don't believe it was retrimmed up very much to the best of my recollection, it may, they may have ruffed it up a little bit where they made a borrow there, but in most of the places why the slopes was retrimmed.

"Q. Supposing this had been borrowed from a place other than a slope, would it have been force account?

"A. Sir?

"Q. Suppose it had been borrowed from a place other than a slope, would it have been force account?

"A. No, sir.

"Q. Why would it be force account because it was borrowed from a slope?

"A. Well, we had already finished the work there one time and trimmed the slope and then went away and we were ordered to dig into it again."

Mr. Sweeney testified in a similar manner in relation to the different items of force account work. He certainly claimed to have a good deal of knowledge in regard to the matter. He stated that he was on the work practically all of the time, and was absent on trips to Portland to borrow money for short periods of time. His testimony in regard to the work being done is not contradicted in any way. Indeed as we understand the theory of the defendant during the trial of the cause, it was not that the force account work was not performed by plaintiff, but that he was not entitled to payment therefor at force account prices; that the liquidation should be at the regular contract or unit prices.

Mr. M. O. Bennett, one of the engineers for the county, in his testimony when a witness in behalf of that defendant, on cross-examination, explained the matter fully as follows:

"Q. Well, these plaintiff's exhibits that have been put in in connection with your testimony, covering disallowed force bills, some of them contain notations by you, and some of them do not, is that correct?

"A. Yes, sir.

"Q. And those force bills which carry notations by you were force bills which you investigated either per-

93 Or.—10

sonally or through reports made to you by your assistants?

"A. Yes, sir.

"Q. And those force bills concerning which you have testified would bear no notations but were disallowed,—what investigation of those did you make if any?

"A. Well, I would say none, I guess.

"Q. Well, why didn't you make investigation of those?

"A. In my opinion they were obviously not force account.

"Q. Because of the character of the work?

"A. Yes, sir.

"Q. You were back and forth on the ground often enough to determine that question?

"A. I think so.

"Q. Now, in these force bills which you have disallowed and upon which you have put notations, there was no question in your mind that the work was done, but the question was, that it was work which fell under the contract, that is the work covered by the disallowed part?

"A. Yes, sir.

"Q. The work was done all right, but it was work that was done under the contract?

"A. Yes, sir.

"Q. And is that true to the other disallowed bills upon which you made no notation?

"A. Yes, sir.

"Q. That is true as to all of the force bills which the plaintiff introduced as well as those particular ones to which you have testified?

"A. Yes, sir."

We find there was substantive evidence showing that the force account work was done. We cannot accede to the point so strenuously urged by counsel.

It is alleged that certain claims against the plaintiff for materials and supplies furnished in the fur-

therance of the construction of the road in question have been filed in the County Court; that some of these have been acknowledged by plaintiff; that it is conceded by the defendant bank that a portion of such indebtedness is superior to its claim. The amounts of such claims do not indicate a necessity of changing the figures of the decree in favor of the claims of the bank. The obligation of the county, if any, to pay such claims for material, etc., should not be prejudiced by a final decree. In order to protect the rights of all parties interested permission should be granted for the hearing and establishment of any such miscellaneous claims in appropriate supplemental proceedings in this suit, upon the application therefor to the Circuit Court by any of such claimants or by the county within thirty days from the date of the entry of the mandate in the lower court, and before the satisfaction of the decree herein in case such parties so desire. As to the amount and interest thereon found and adjudged to be due to the defendant bank, the payment should not be delayed on account of such claims. That in the event any such claim or claims are legally adjudged to be due from plaintiff, the same shall be deducted from the decree in favor of plaintiff in satisfaction thereof, to the extent of such established claims.

With this provision added, we adhere to our former opinion.          AFFIRMED.   REHEARING DENIED.